COMMERCIAL TRUST COMPANY OF NEW JERSEY AND GEORGE I. MASON, AS TRUSTEES, *ETC.*, PLAINTIFFS-RESPONDENTS, v. BEULAH G. BARNARD, *ET AL.*, DEFENDANTS-APPELLANTS.

Argued April 22, 1958—Decided June 16, 1958.

*Mr. Elmer J. Bennett* argued the cause for the defendants-appellants Beulah G. Barnard, *et al.* (*Messrs. Carpenter, Bennett, Beggans & Morrissey,* attorneys).

*Mr. J. Fisher Anderson* argued the cause for the plaintiff-respondent Commercial Trust Company of New Jersey (*Messrs. Anderson, Rugge & Coleman,* attorneys).

*Mr. Thomas McNulty* argued the cause for the plaintiff-respondent George I. Mason (*Mr. William Bannon* on the brief; *Messrs. Millon, McNulty & Augelli*, attorneys).

*Mr. James F. McGovern, Jr.*, argued the cause, as attorney *pro se*, as guardian *ad litem* for infant defendants-appellants and as attorney for William I. Spiegelberg, defendant-appellant representing unborn issue.

The opinion of the court was delivered by

BURLING, J. This is an appeal from the disallowance of exceptions to a first intermediate accounting of an *inter vivos* trust in the Chancery Division of the Superior Court. We certified the cause on our own motion prior to hearing in the Superior Court, Appellate Division.

On January 21, 1920 Isaac Guggenheim, a resident of New York, executed a trust indenture in New Jersey, with express provision that the trust be administered according to the laws of this State. Three daughters of the settlor were the life beneficiaries, remainder to their respective issue *per stirpes*. The *corpus* consisted of 1267 Chile Copper Company Collateral Trust 6% Gold Bonds, Series A, with the face value of $1,000 each due April 1, 1932.

The settlor named the Commercial Trust Company of New Jersey as corporate trustee and George I. Mason, his personal secretary, as individual trustee. The trust provided that the settlor was to retain absolute control over investments during his lifetime, and upon his death the power to veto investments was given to brothers and nephews.

The settlor died in 1922, and from that date until December 4, 1937, when they notified the trustees they were no longer willing to serve in the manner provided in the trust indenture, all investments were made by the trustees only with the written consent of one or more of the brothers and nephews of the settlor. Since December 4, 1937, as provided by the trust indenture all "sales, exchanges, substitutions, investments or reinvestments" of *corpus* were "in the discretion of the Trustees: and the Trustees shall not

be restricted from continuing any investments for the trust fund in their then existing form, or from changing the same to any other form that may be deemed proper as above provided; nor shall they be obligated to invest the same as might otherwise be provided by law."

The Chile Copper Company bonds were redeemed by the obligor for $1,393,700 in 1927. The policy of investment at that time was formed by the Guggenheim brothers who determined that the *corpus* be invested in tax-exempt securities. This policy of purchasing tax-exempt securities has since been pursued by the trustees. All of the securities held by the trustees at the terminal date of the instant first intermediate account were of the tax-exempt class.

The account, covering the 35-year period from January 21, 1920 until April 6, 1955, was filed on October 14, 1955. Six exceptions to the account were filed jointly by the income beneficiaries, the three daughters of the settlor, and by the adult remaindermen. Substantially similar exceptions were presented by James M. McGovern, Jr., attorney *pro se,* acting as guardian *ad litem* for infant remaindermen and as attorney for William I. Spiegelberg appointed to represent the interests of unborn issue.

The issues which emerge from the exceptions are whether the trustees may be surcharged for continuing in the policy of investing in low-yield governmental securities from 1945 until the terminal date of the account, and whether the individual trustee, Mr. Mason, is entitled to any commissions or compensation in excess of $500 per year under the terms of the trust instrument. The trial court disallowed all exceptions and affirmed the account as stated.

## I.

The gravamen of the complaint of the life income beneficiaries is that "the trustees have never attempted to exercise any judgment with regard to diversification, except within the narrow confines of low-yield governmental obligations." The remaindermen joined in this exception.

The life income beneficiaries have introduced into evidence a chart showing the average annual yield of the trust from the time of the redemption of the Chile Copper Company bonds, 1927, until April 1, 1955. The yield is computed upon the basis of $1,393,700 (the redemption value of the Chile Copper bonds). No adjustment of the basis was made for deductions from *corpus* of $58,706.35, representing premiums for securities purchased over the years and held to maturity, and for other deductions totalling $60.49 (at the same time, however, $16,995.57 representing *corpus* gains from discount purchases, were not included). We might note at this point that one of the exceptions originally filed on behalf of the remaindermen sought a surcharge for the failure of the trustees to amortize from interest received the beforementioned premium loss of $58,706.35, thus favoring income beneficiaries, but the exception was withdrawn at trial.

For present purposes the following summary of the chart submitted by exceptants is a sufficiently accurate indicator of the average annual yield of the trust:

The average annual yield of the trust for the period from April 1, 1927 until the end of 1944 ranged in a descending scale from a high of 4.27% in 1927 to a low of 2.34% in 1944. From 1945 to date the average annual yield ranged in a descending scale from a high in 1945 of 2.17% to a low in 1955 (to April 1) of 1.51%.

The exceptants maintain that the trustees should have at least considered revising their investment policy in 1945 when the average annual yield fell below 2¼%. They contend that average discretionary trusts were yielding a 4½% or better return on investments during the period from the beginning of 1945 until the terminal date of the account, and seek to surcharge the trustees for the difference between the actual yield and the alleged 4½% yield earned by average discretionary trusts, plus interest.

In order to demonstrate the prevailing policies of investments in discretionary trusts the exceptants called as an

expert witness an attorney with experience in the fields of trusts and estates. The expert had been a member of a sub-committee of the American Bar Association inquiring into the "Changing Concepts of Trust Investments," and had personally acquired data and statistics on that subject for the States of New York and New Jersey in preparation for a report of the committee submitted to the American Bar Association in 1955. In addition, he had surveyed the investment policies of common trust funds in New York and New Jersey and had investigated a sample of some 20 or 25 accountings of discretionary trusts handled by his own office over a period of years. Without going into detail, we might summarize the expert's findings as follows: that trustees of discretionary trusts invest, on the average, some 40% of the *corpus* in common stock and that these trusts yield, on the average, approximately 5%. These figures are, of course, statistical averages, and it is of significance that when counsel on cross-examination inquired of the expert as to what the policies of trustees would be with regard to investing in common stocks where the income beneficiaries were in high tax brackets, he responded "I don't know what the fiduciary would do in a particular case."

In order to demonstrate the net return to the beneficiaries when income taxes are taken into consideration, the trustees introduced into evidence tables showing the income tax brackets of the life income beneficiaries, excluding capital gains and losses and before income from the trust. (The basic information concerning the exact net income of the beneficiaries was acquired by answers to interrogatories propounded prior to trial.) The result of these tables are as follows:

1. Edith G. Hewes had an average tax rate of 83.2% for the years 1945 through 1954.

Calculated at a rate of 84% to produce a net yield after taxes of 2.25%, it would have been necessary to earn a fully taxable yield of 14.06%; to produce a net yield after taxes of 1.75% it would have been necessary to earn a fully

taxable yield of 10.94%, and to produce a net yield after taxes of 1.50% it would have been necessary to earn a fully taxable yield of 9.37%.

2. Beulah C. Barnard had an average tax rate of 68.05% for the years 1945 through 1954.

Calculated at a rate of 69% in order to produce net yields after taxes of 2.25%, 1.75% and 1.50%, respectively, it would have been necessary to earn fully taxable yields of 7.26%, 5.65% and 4.84%.

3. Helene G. Ward had an average tax rate of 64.8% for the years 1950 through 1954. Calculated at a rate of 65%, in order to produce net yields after taxes of 2.25%, 1.75% and 1.50%, respectively, it would have been necessary to earn fully taxable yields of 6.43%, 5.00% and 4.29%. For the years 1945 through 1949 she had the status of a non-resident alien and was therefore only subject to a 15% federal income tax rate. This fact has no appreciable bearing on the duty of the trustees since they were required to deal with the *corpus* as a whole for the benefit of all three life income beneficiaries as well as the remaindermen. They could not be expected or required to change their investment policy because of the temporary tax status of one of the income beneficiaries.

We might note that although the exceptants have had ample opportunity to do so, no evidence seriously disputing the accuracy of the income tax status of the beneficiaries or the calculations concerning relative advantages to them of tax-exempt versus taxable income from the trusts has been offered. It is apparent that, on the whole, the life income beneficiaries fared better by having the trust *corpus* invested in low-yield tax-exempt securities than by having it invested in higher-yield taxable securities which it is alleged would have earned a yield of 4½%.

Exceptants' primary contention is that the trustees have failed to exercise any judgment with regard to the propriety of investing in higher-yield securities. They allege an adamant refusal over the years to even consider investments other than tax-exempts.

■■ It is the duty of a trustee, imbued by the settlor with discretionary powers, to exercise active judgment and not to remain inert. The standard is set forth in 2 *Scott on Trusts,* § 187.3, *pp.* 995–996 (1939) as follows:

"Where by the terms of the trust a discretionary power is conferred upon the trustee and the exercise of the power is left to his judgment, the court will interpose if the trustee fails to use his judgment. This is true even though what is done by the trustee or what he fails to do would have been proper if he had used his judgment. Where he does not use his judgment, he has not acted in the state of mind in which it was contemplated by the settlor that he should act."

See also *Restatement, Trusts,* § 185, *comment* (h) (1935). *Cf. Conlin v. Murdock,* 137 *N. J. Eq.* 12 (*Ch.* 1945).

The facts in the present case would not sustain a finding that the trustees have failed to exercise judgment with respect to investments, but rather support the conclusion that they have been alert to the relative advantages to be derived from the investment policy pursued.

■■ The exceptants urge that the trustees cannot derive any comfort from the tax status of the income beneficiaries because the information was not uncovered by the trustees concerning their exact income from other sources prior to discovery proceedings in this action. Exceptants allege that the trustees during the 35-year period covered by the pending account never made any inquiry of the beneficiaries to ascertain their financial status. The trustees cannot, of course, justify their conduct on the basis of facts which were not within their knowledge at the time they acted. But the facts indicate that the trustees, though without knowledge of the precise income status of the beneficiaries, were in possession of sufficient knowledge of their general tax brackets to exercise a reasonable judgment with regard to investments.

It will be recalled that the initial trust policy of investing in tax-exempts was formulated by the members of the settlor's immediate family, the Guggenheim brothers, during the period in which they exercised their veto power over investments. Thus, as late as 1937 the trustees were apprised

by those who presumably acted in the best interests of the beneficiaries and were in a position to determine the facts that the tax status of the beneficiaries warranted investments in tax-exempts.

Moreover, the individual trustee, Mr. Mason, had served as personal and financial secretary to the settlor from 1906 until the time of his death. Mr. Mason had an intimate acquaintance with the settlor's financial affairs. He knew that the settlor left an estate of $11,000,000. He was also trustee for another *inter vivos* trust established by the settlor for the benefit of his wife, Carrie Guggenheim, the remainder on her death to his daughters. He knew that each of the instant life income beneficiaries received $1,300,000 from that trust after Carrie Guggenheim's death. Mr. Mason was also aware of the fact that the settlor's daughters had married men of substantial means. In sum, this knowledge afforded a basis for a reasonable inference that the life income beneficiaries all were in high income tax brackets. And as late as 1950 the trustees' estimate of the tax status of the beneficiaries was confirmed when, during a series of correspondence with the attorney for one of the beneficiaries concerning the advisability of retaining $128,000 in United States Government bonds, the attorney wrote:

"I might state at the outset that both Mrs. Barnard and Mrs. Hewes, two of the income beneficiaries, are in high tax brackets. Therefore the investments which would yield them the greatest net return after taxes would be either tax exempt bonds or common stocks yielding a fairly liberal return."

██ Exceptants further contend that the failure to exercise judgment is manifested by the adamant refusal to consider requests by them over the years to diversify investments. The communications from the life income beneficiaries to the trustees amounted, in the main, to nothing more than requests for the list of investments held. They cannot be read as firm demands for a change in investment policy, and although several of the communications were written by attorneys for one or more of the life income beneficiaries no

formal action was ever taken by them. Moreover, there has been no such communication between the life income beneficiaries and the trustees since 1950. These communications do not evidence an obstinate refusal of the trustees to exercise judgment.

Exceptants contend that by investing solely in governmental securities the trustees have breached their duty to diversify investments. See *In re Ward's Estate,* 121 *N. J. Eq.* 555 (*Prerog.* 1936), affirmed 121 *N. J. Eq.* 606 (*E. & A.* 1937); *Pennsylvania Company, etc., v. Gillmore,* 142 *N. J. Eq.* 27 (*Ch.* 1948); 2 *Scott on Trusts,* § 228 (1939); *Restatement, Trusts,* § 228.

Exceptants have misconceived the import of the doctrine that the trustees have a duty to diversify investments.

The *Restatement of Trusts,* § 228, *comment* (a), provides:

"The trustee is under a duty to the beneficiary to exercise prudence in diversifying the investments so as to *minimize the risk of large losses,* and therefore he should not invest a disproportionately large part of the trust estate in a particular security or type of security."

The italicized phrase is the reason for the rule, *i. e.,* avoidance of large losses resulting from the deflation in value of a particular security. It is difficult to perceive how the trustees could have better protected the trust assets from the hazards of the market than by investing in governmental securities.

In 2 *Scott on Trusts, supra,* § 227.3, *p.* 1203, it is stated:

"The primary purpose of a trustee should be to preserve the trust estate, while receiving a reasonable amount of income, rather than to take risks for the purpose of increasing the principal or income. In other words, a trustee must be not merely careful and skillful but also cautious."

The law requires that a trustee exercise that degree of care, prudence, circumspection and foresight that an ordinary prudent person would employ in like matters of his own. *Blauvelt v. Citizens Trust Co.,* 3 *N. J.* 545, 554 (1950); *In re Koretzky's Estate,* 8 *N. J.* 506, 524 (1951); *cf. N. J. S.* 3A:15–19.

We conclude that the trustees have fully acquitted the duties imposed upon them by pursuing the investment policy that they have, bearing in mind the high income status of the beneficiaries.

At the trial the remaindermen attempted to introduce evidence that as of December 18, 1956 there was a *corpus* loss amounting to about a quarter of a million dollars. This evidence was excluded by the trial court on the ground that it related to a period outside of the terminal date of the account, April 6, 1955.

The trial court's determination is correct. The only issues encompassed in this litigation are those concerning losses occurring during the period of the account. *In re Schlemm's Estate*, 130 *N. J. Eq.* 295 (*Prerog.* 1941); *Isham v. Union County Trust Company*, 7 *N. J. Super.* 488 (*Ch. Div.* 1950).

## II.

Exceptants appeal from that portion of the judgment below awarding *corpus* commissions of $21,160.43, being 1½% on *corpus* of $1,410,695.57, to the individual trustee, Mr. Mason. This sum was in addition to compensation of $500 per year already paid Mr. Mason over the period of the trust, amounting to $17,625. The corporate trustee has only claimed commissions of $500 per year for its services as provided by the trust indenture.

The provision of the trust indenture relative to the question of the right of the trustees to commissions reads as follows:

"TENTH: The Corporate Trustee shall be entitled to receive as compensation for its services in the administration of this trust a commission of one half (½) of one (1) per centum ($500 minimum) per annum upon all income received under the trust, and is hereby authorized to deduct such commissions from the said income. Upon the termination of the trust, the Corporate Trustee shall be entitled to no other or further commission than herein first specified. The Individual Trustee shall be entitled to receive as compensation for his services at the rate of Five Hundred Dollars ($500.) per annum, payable in semi-annual instalments on the first day of January and July in each year, while acting as Trustee hereunder, and the Corporate Trustee is hereby authorized to deduct such commission from the said income."

Exceptants contend that there is a significant difference between the language fixing the compensation of the corporate trustee and the language fixing the compensation of the individual trustee. In the former case, the specified percentage of income and the specified minimum fee of $500 per annum are referred to as a "commission," "upon all income." In the latter case, there is no statement that the fixed fee of $500 per annum is to be a "commission" or that it is "on income"; it is referred to simply as "compensation."

This reference to the language utilized ignores the phrase "the Corporate Trustee is hereby authorized to deduct such *commission* from the said income." (Italics supplied.) The construction problem cannot turn on the distinction between a commission and compensation. The settlor used the terms interchangeably.

The determinant of intent is the significant omission of the restrictive provision concerning commissions in the case of the individual trustee. The settlor was undoubtedly familiar with the fact that trustees usually receive commissions on both income and *corpus.* His knowledge is demonstrated by the provision that "upon the termination of the trust" the corporate trustee "shall be entitled to no other or further commission." If the settlor had intended that the individual trustee be similarly restricted, it would have been a simple matter to include a similar provision with respect to the individual trustee. His silence is evidence of an intention to allow Mr. Mason *corpus* commissions.

Assuming *arguendo,* that some doubt exists from a construction of the language, there is a further reason for determining that Mr. Mason is entitled to *corpus* commissions from the trust. We have previously made mention of the fact that the settlor had established another trust, naming his wife as life tenant and his daughters as remaindermen. The final accounting in that trust precipitated litigation, and among the issues involved was the right of the individual trustee, Mr. Mason, to receive *corpus* commissions. That trust contained a provision identical with paragraph TENTH of the instant trust, and the court determined that the settlor's

intent was to allow *corpus* commissions to Mr. Mason. *Commercial Trust Company of New Jersey v. Spiegelberg,* 117 *N. J. Eq.* 171 (*Ch.* 1934), affirmed *per curiam sub nom. Commercial Trust Company of New Jersey v. Mason,* 119 *N. J. Eq.* 376 (*E. l& A.* 1936). Thus, that determination fortifies the conclusions reached herein.

Exceptants further contend that, assuming under the terms of the trust that Mr. Mason is entitled to commissions on *corpus,* he cannot, in any event, receive such commissions at the time of the intermediate account, but must await the final accounting. It is the law of this State that in the absence of an express provision in the trust clearly indicating the contrary, a trustee entitled to commissions on *corpus* may claim an appropriate portion at the time of an intermediate accounting and is not required to wait until the termination of the trust. *N. J. S.* 3*A*:10–2 and 3*A*:10–4. See *Conover v. Ellis,* 49 *N. J. Eq.* 549 (*Prerog.* 1892); *In re McMillin's Estate,* 120 *N. J. Eq.* 432 (*Ch.* 1936); *Gates v. Plainfield Trust Company,* 123 *N. J. Eq.* 519 (*Ch.* 1938); *Appleby v. Appleby,* 140 *N. J. Eq.* 8 (*Ch.* 1947), affirmed 140 *N. J. Eq.* 403 (*E. l& A.* 1947); *Corry v. Passaic National Bank and Trust Company,* 3 *N. J. Super.* 569 (*Ch. Div.* 1949); *In re Cox's Estate,* 21 *N. J. Super.* 287 (*Ch. Div.* 1952).

Lastly, exceptants assert that the allowance of $21,160.43 for the services performed by Mr. Mason is unreasonable. We find this contention without substantial merit. The period covered by the instant account is more than 35 years, and the evidence relating to the services performed by Mr. Mason during that time plainly justified the amount awarded him by the court below.

The judgment below is affirmed.

HEHER, J. (for modification). The holding of the majority is that the trial court properly excluded the remaindermen's offer of evidence that "as of December 18, 1956 there was a *corpus* loss amounting to about a quarter of a million dollars," as relating to "a period outside of the terminal date of the

account, April 6, 1955," and the "only issues encompassed in this litigation are those concerning losses occurring during the period of the account." There was evidence of unrealized *corpus* losses of $16,905.39 as of the terminal date of the account. By their appeal, the infant remaindermen's guardian *ad litem* and the guardian *ad litem* of the unborn issue of Beulah G. Barnard, Edyth G. Hewes, Helene G. Ward and Wanda Helene Paley Johnson seek "to surcharge the trustee because it neglected to properly diversify the trust investments," contending that upon the death of one or more of the income beneficiaries, "the Trust will terminate in part or in whole, and what is now an unrealized loss in the *corpus* would immediately become a realized loss to the remainder beneficiaries." The answer of the trustees is that the remaindermen "cannot complain of any alleged failure of the trustees to produce the greatest income for the life income beneficiaries"; the "loss is a 'paper' loss subject to re-evaluations by the changing aspect of the investment market in which the assets of the trust are invested," and the trustees are not surchargeable for the alleged *corpus* loss.

I would modify the judgment to reserve in terms the issue of the trustees' accountability for this unrealized *corpus* loss, and thus to insure that the plea of *res judicata* will not be a bar to litigation of the issue if the loss becomes a reality.

The trustee is under a dual fiduciary duty to the remaindermen and the income beneficiaries; and diversification of the investments may be the course of prudence for the preservation of the *corpus,* depending upon varying economic hazards and conditions. The fiduciary's duty is concerned with the security of the trust *res* and a reasonably adequate income.

Otherwise I concur in the opinion.

*For affirmance*—Chief Justice WEINTRAUB, and Justices WACHENFELD, BURLING, FRANCIS and PROCTOR—5.

*For modification*—Justice HEHER—1.