212 N.J. Super. 368 (1986)
515 A.2d 255
BARBARA P. JOHNSON, PLAINTIFF,
v.
J. SEWARD JOHNSON, JR., ET AL., DEFENDANTS.
Superior Court of New Jersey, Chancery Division Mercer County.
Decided March 7, 1986.
*371 H. Curtis Meanor, Gregory P. Reilly and Ina B. Lewisohn, for plaintiff.
Richard M. Altman, Anne P. McHugh, and E. Elizabeth Sweetser, for defendants.
LEVY, P.J. Ch.
This action concerns the administration of the investment of assets, valued at approximately $100 million, of two charitable foundations. It was brought by Barbara P. Johnson, a former trustee, against J. Seward Johnson, Jr., a trustee, chairman of the finance committee and investment manager, and against the foundations. The Attorney General has intervened as an additional plaintiff.
Plaintiff seeks the ouster of defendant Johnson as investment manager, as chairman of the finance committee, and from any role in directing the investments of the foundations. The basis asserted for this relief is that he was negligent in the design and implementation of the foundations' equity investment program. Plaintiff also seeks to have him surcharged for $48,772,931 which, she claims, the foundations lost because of his gross departure from accepted standards of care. The Attorney General agrees to the ouster but not the surcharge, and he takes no position as to any liability issues. Rather, the Attorney General argues that professional management advice is required for a charitable investment portfolio of the size found here, and that while defendant Johnson may not have been negligent, his lack of professional training alone requires his removal from a position in which investment decisions are controlled.
*372 Defendants claim that plaintiff cannot maintain this action, in equity, because she brought it in bad faith, and she breached her duty, as a trustee of the foundations, to advise her fellow trustees of her agreement with her husband assuring him that the foundations would receive a significant benefit from his estate. Additionally, defendant Johnson argues that his conduct was not negligent and that there is no valid basis for either his removal or the imposition of a surcharge.

The Court's Factual Findings.
From all the testimony, the court finds the following are the relevant and believable facts. In 1963, J. Seward Johnson, Sr. directed the incorporation of The Atlantic Foundation, in New Jersey, for charitable, educational and scientific purposes. In 1973 The Harbor Branch Foundation was similarly incorporated in Florida. Each foundation has headquarters in New Jersey. Atlantic uses its assets to make grants to other charitable organizations, but its principal beneficiary is Harbor Branch, which has operated as an oceanographic research facility since its inception. Oceanographic research activities at Harbor Branch were directed, to a great extent, by Edwin A. Link, a long-time associate of Johnson, until Link died in 1981.
Each foundation was formed with trustees, directors and officers as the executives in charge. The "members," as defined in N.J.S.A. 15A:1-2(h), were called trustees and the "trustees" envisioned by N.J.S.A. 15A:1-2(i), were called directors.
Johnson,[1] was a principal stockholder of Johnson & Johnson, and he funded these foundations with stock from that corporation. He headed and dominated the foundations,[2] but he *373 groomed his son J. Seward Johnson, Jr.,[3] to take his place. When Harbor Branch was created, Senior was made President and Seward and plaintiff (Senior's wife) were made Vice-Presidents. Plaintiff was an incorporator of Harbor Branch, but she never had a significant role in its operational or financial activities.
Shortly thereafter, being displeased with an action taken in his absence by certain non-family trustees, Senior insisted that a majority of the board of trustees be members of the Johnson or Link families. In 1980 he reorganized each foundation, creating two classes of trustees: one class A trustee with eight votes and five class B trustees with one vote each. Senior was the original class A member; the original class B members included plaintiff, Seward, and his half-brother James L. Johnson. This reorganization illustrates Senior's absolute control over the foundations' organization at that time. Financial matters, including supervision and investment of assets, were always delegated to the finance committee, consisting of Senior, Seward and James. Other policy matters were delegated to the executive committee, chaired and controlled by Senior.
James never had a role of any consequence on the finance committee. The finances, including the investments of the corporate assets, were controlled by Senior and then by Seward. Until his death in May 1983, Senior remained a significant force in the foundations' operations, although his son Seward was denominated as the person responsible for investment decisions.
Seward became involved with the investments when he became a member/trustee in 1973. He became the chairman of the finance committee at that time and has so remained except for a short period in 1978-79 when he lived in Paris, and Senior was the chairman of the committee. In 1977 the finance committee met frequently to consider various strategies for *374 investing the foundations' assets, which Senior had agreed to diversify. However, he rejected all types of outside help such as professional money managers, bank trust departments and mutual funds, having had an unsatisfactory experience with T. Rowe Price Company, a well-known investment management firm. When Senior expressed his intention to have Seward alone manage the investments, he (Seward) was apprehensive, having no significant experience in these matters. But he accepted the role.
The foundations began to sell off the Johnson & Johnson stock and invest in common stocks of publicly traded companies. Senior believed that he, Seward and the staff could develop expertise in the management of the foundation finances, so they continued on their own. At no time did plaintiff have substantive involvement in these activities at either the operational level or on the board of trustees.
Sometime in 1977-1978, the two Johnsons consulted with personnel of Merrill Lynch concerning the use of a computerized system of asset management. Neither Senior nor Seward nor their employees had been trained in the theories of investment analysis, but they thought that they had been successfully diversifying and reinvesting the equity portfolios of the foundations, and with guidance from Merrill Lynch, it was thought that the computerized system would yield good results. The Merrill Lynch personnel directly involved in this project were the account executive who had been retained by Senior to handle the foundations' accounts since 1974, and the manager of the institutional computer services department; other Merrill Lynch departments had input as well. In 1979, Seward returned from nine months in France and he was renamed chairman of the finance committee of each foundation. By then the computer system was ready for implementation, and Seward became the investment manager of the foundations' assets.
Senior believed that some types of industries were stronger than others, so he directed the exclusion of those which he *375 believed to be weaker from the universe of 6,000 to 7,000 companies whose stock was offered for sale to the public on the stock market. These qualifications[4] were then programmed, by a consultant working with Merrill Lynch personnel, into a computer selection system and called "fundamental screens." The screens acted to reduce to fewer than 1500 the number of companies targeted for investment.
Those companies were then ranked by their "relative strength," that is, by comparison to other companies based on variations in market prices.[5] The relative strength theory holds that stocks which have been strong in relation to other stocks would continue to be relatively stronger in the future. Such a measure of relative price strength could most objectively and precisely be calculated by a computer. The relative strength theory is one of many accepted methods of investment strategy. Its distinguishing characteristic was that it is based on price trends rather than on a measure of intrinsic value.
After the fundamental screens had eliminated approximately 80% of the companies on the stock exchange, and either before or after the relative strength ranking list of the remaining companies was prepared by Merrill Lynch and forwarded to the foundations, certain rules were implemented before buy/sell instructions were given to the Merrill Lynch account executive. Seward and Senior had rules about which industries to invest in and which to ignore, as well as rules as to how much to invest in any particular industry. These rules changed as their perception of the market conditions changed.
*376 As experience dictated, and guided by daily advice from a Merrill Lynch expert (Robert Farrell), the investment manager would determine if the foundations should expose or withdraw assets from the investment market. The timing of the purchases and sales was independent of the computer programs, which only provided candidates for purchase or sale. The investment manager had to make the ultimate decision after considering the needs of the foundations and the conditions of the market. In doing so, he relied on advice from Merrill Lynch and other sources as to market timing, as well as on advice from Senior.[6] When he had settled on a "buy list" he would advise the account manager of its contents and the amount of money available for investment. The account manager would then execute the orders.
Tests were developed to be sure the computerized screening process worked. A reporting system was created which produced a daily portfolio summary report called an equity progress report.[7] This comprehensive document reported the adjusted market value of equities and options owned by the foundations, as well as cash and equivalents. It also reported performance as measured against the Dow Jones and the Standard & Poor's 500 indexes in terms of percentage and actual value for the day, week and year. Of course, it also gave a comprehensive inventory of the common stocks and options along with individual stock performances and every market indicator one could ever digest, except for the beta factor, a popular statistic showing relative volatility.
That computer stock selection system remained the same from 1979 to 1984 with Seward as investment manager, relying on the Merrill Lynch computers to screen the total market for *377 qualifying companies and for ranking those companies as to relative price strength.
In addition to his involvement with the financial aspects of the foundations, Seward carried on Senior's interest in oceanography when he (Seward) became heavily involved with the daily operations of Harbor Branch. Under his leadership, that foundation has become a respected leader in the oceanographic scientific and educational community. The physical facilities and scientific staff at the Florida location have grown tremendously in recent years, enabling that foundation to obtain significant grants to fund its research projects. At a cost of seven million dollars, it has built the most sophisticated oceanographic research ship in the world, the R/V Seward Johnson, and has developed many submersible vessels and tools. Harbor Branch interacts with such respected institutions as the Smithsonian Institution, the Woods Hole Oceanographic Institute, the National Oceanic and Atmospheric Administration and several university and government departments. Also under Seward's leadership, its most significant new development is in the field of recovering materials from the oceans to use in manufacturing pharmaceuticals; in this venture Harbor Branch has joined with a company known as SeaPharm. More and more, the trustees have relied on Seward's vision which has fostered the great progress made by Harbor Branch.
Beginning in 1981, the foundations paid Seward $95,000 annually for his services as president and investment manager. This "compensation package" was reviewed by the foundations' auditors and a written report dated March 14, 1983 was sent to the controller for presentation to and consideration by the board of trustees. That report indicates that the compensation was reasonable for the work done. The trustees continued this compensation from year to year.
In assessing the fiscal activities of the foundations, the court reviewed documentation presented by both parties. The foundations' internal financial statements, some auditied and some *378 not, are persuasive, because they qualify as business records and they deal with timely market values. Arthur Andersen & Co., auditor for plaintiff, on the other hand, was unfamiliar with the daily facts and originally only considered book value instead of market value. The two witnesses from that company were not persuasive, and the court is not confident of the validity of their work product, except that regarding trading activity shown on the last three lines of the following table. Certain statistics are displayed on TABLE 1, infra, which the court has concluded to be factual. It is helpful to examine the financial statistics from 1979,[8] the year when Seward began as full time investment manager, until the end of 1985, when the assets had been liquidated and placed with outside money managers.

 TABLE 1.
 STATISTICAL FINDINGS FOR THE COMBINED FOUNDATION PORTFOLIOS.
 (Dollars in Millions)
Year 1979 1980 1981 1982 1983 1984 1985
Adjusted Market
Value of Corpus $103.7 $108.6 $109.7 $126.3 $107.2 $ 86.8 $90.9
Realized and
Unrealized Gain
(Loss) on
Investments $ 12.2 $ 9.4 $ 6.1 $ 24.0 ($ 8.5) ($ 9.1) $16.3
Rate of Return
on Investments
Incl. Div/Int 13.1% 9.3% 5.8% 22.6% (7.0%) (9.1%) 20.2%
Rate of Return
for S & P 500
Balanced Funds
Incl. Div/Int 18.7% 32.4% (5.3%) 21.5% 22.6% 6.3% 31.7%
Rate of Return
(median manager)
SEI Balanced
Funds Index 11.8% 19.3% 1.7% 23.8% 15.1% 7.2% 25.4%
---------------------------------------------------------------------------

*379
Investment $111.5 $117.6 $123.9 $142.9 $130.8 $115.5 ***[9]
Assets
Year-End Audit
(Book Value)
Investment
Assets Change
from Prior Year
(Book Value) $ 3.5 $ 6.1 $ 6.3 $ 19.0 ($12.1) ($15.3)
(Percentage) 3.2% 5.5% 5.4% 15.3% (8.5%) (11.7%)
---------------------------------------------------------------------------
Shares Traded
(millions) 8.4 14.4 39.0 46.5 17.6
Commissions $ 1.62 $ 2.59 $ 4.68 $ 6.18 $ 2.97
Turnover 300% 760% 1300% 940% 480%
---------------------------------------------------------------------------

From these statistics and the credible testimony presented from depositions and several witnesses, the court finds that the foundations, led by the Johnsons, maintained a very active portfolio of common stocks, while at the same time balancing the significant cash needs required to avoid an income tax penalty and to support their operating expenses.
The primary goal was to limit risk, and another was to keep a large percentage of assets in cash equivalents. The investment system, moreover, was designed to concentrate on a limited group of companies for purposes of buying common stock. Accordingly, the system eliminated the most risky stocks. It is important to note that risk and rate of return are proportionately related, so the expected return was not high.
The overall results, compared to two leading market indexes, show that in 1979 the performance was behind the Standard & Poor's 500 index[10] but ahead of the SEI service.[11] The 1980 *380 performance was unfavorable, but the system was in a stage of infancy and was entitled to a fair evaluation. 1981 showed excellent performance as the total portfolio was up while the market was down. 1982 was good as the portfolio was slightly better than the S & P 500. 1983 and 1984, however, showed serious losses overall. In 1985, when most of the assets were in cash or were invested by outside investment managers, performance rebounded but still underperformed the market indexes.
The first four months of 1983 showed a $6 million increase in value, but the value fell drastically to end with an annual loss of $8.5 million. Seward did not change his market investment methodology during 1983, and the results were mystifying as well as unsatisfactory. During that year, Carl Schafer, the chief financial officer of Princeton University, became a member of the board of directors of Harbor Branch Institute. He met often with Seward, and it was during those meetings that Seward explained the fundamental outline of the foundations' investment system. Schafer learned that the system involved the use of fundamental screening techniques, that relative strength was the basic method for stock selection, and that the foundations relied on Robert Farrell of Merrill Lynch for market timing advice.
In January 1984, Schafer became a member of the board of trustees and a paid consultant to the finance committee. In these capacities, he examined the stock holdings and concluded *381 they were a well diversified group of stocks of institutional quality which were not highly speculative. He asked about performance and learned that there were good and bad years, but overall results were satisfactory in light of the main objective, which was to limit risk. He realized that a lower rate of return was expected because the foundations held a substantial quantity of cash, and the application of the fundamental screens greatly reduced risk.
He was not alarmed by the use of the relative strength method, even though the recent results were very negative. He was concerned about the high amount of turnover, but knew it was a necessary result of the relative strength system. He concluded that the system had performed reasonably well, so it should not be hastily discarded. Schafer did not specifically evaluate the efficacy of the stock selection system itself. He advised the finance committee (Seward) to retain the methodology through the first quarter of 1984, because the short period of time in which the results were negative was insufficient for a fair evaluation. After this lawsuit was filed in February 1984, he discussed its effect on the investment activities with Seward, and counseled him to proceed carefully and only make system changes which were clearly sensible. In the next few months, he and Seward discussed the use of outside money managers. Feeling the pressure of the litigation, they decided in August to place at least a portion of the assets with outside managers. Although Schafer knew several such organizations from his Princeton contacts, he wanted to be sure Seward was comfortable with these other people. Schafer was aware of Seward's earlier experience with T. Rowe Price & Co.
Seward then began to liquidate the holdings, and Schafer began to contact managers, intending to place only some of the assets outside. On behalf of the finance committee, Seward and Schafer drew up a statement of investment policy for these outsiders to follow. Only $15 million was turned over to an outside investment manager, Scudder, Stevens & Clark, in December 1984, but the balance, save for $10 million in cash *382 and a real estate investment, was put under outside management in 1985. Schafer became a member of the finance committee in 1985. In March, $5 million from Scudder, Stevens & Clark was invested with PrimeCAP (one of Princeton University's investment managers); in April, approximately $46.2 million was invested with The Vanguard Group of Investment Companies; and on August 30, 1985, another $5 million from Scudder, Stevens & Clark was invested with Templeton Investment Counsel, Inc. The committee intends to continue to use these managers while it tries to develop a good internal system; if a system is developed and satisfactorily tested, it would then consider retrieving some assets for inside management.

The Right to Equitable Relief.
In May 1983, after a prolonged illness, Senior died of cancer while residing in Florida. In the few months preceding his death he executed several wills. In the allegedly last will, dated April 14, 1983, and seemingly contrary to a desire he had expressed while alive, there was no specific bequest or devise to Harbor Branch. Rather, Senior gave plaintiff a limited testamentary power to appoint part of his estate to charitable institutions of her choice, and if the power was not exercised, the property involved was to go to Harbor Branch. On that same date, plaintiff executed a handwritten letter to Senior, in which she expressly agreed not to exercise that power in her will so that the property would go to Harbor Branch upon her death. However, because of plaintiff's pique at Seward and Harbor Branch, and probably for her own benefit as well, plaintiff did not disclose this agreement when she and her attorney offered the will for probate.[12]
In March 1984 plaintiff responded to an affidavit which had been filed by Seward in the within litigation. He had stated *383 that in the will being offered for probate in New York, Senior had "left nothing to either Atlantic or Harbor Branch." Her response said:
To the contrary, my husband donated, during his lifetime, assets to Atlantic and Harbor Branch which at my husband's death had a value of approximately $130,000,000. In addition, under my husband's Will, Harbor Branch is a contingent remainderman of a substantial trust.
What plaintiff failed to state in this affidavit was that she had agreed, by letter of April 14, 1983, to remove the contingency by not exercising a power of appointment against Harbor Branch in her will. When these affidavits were filed, of course, Seward and Harbor Branch were unaware of the letter agreement.
Most importantly, plaintiff breached her duty of fidelity to Harbor Branch as one of its members and trustees. See Valle v. North Jersey Auto Club, 141 N.J. Super. 568, 573 (App.Div. 1976). Having no knowledge of the letter, Harbor Branch had no way of knowing that it would receive a valuable testamentary grant from Senior's estate. It was unable to consider this interest in its fiscal planning. As a member of the board of trustees, plaintiff owed complete loyalty to the foundation. Plaintiff had to reveal this letter and to honor her obligations thereunder, excluding any selfish interest. See Societa Operia v. DiMaria, 40 N.J. Super. 344, 348 (Ch.Div. 1956). Plaintiff's testimony to the effect that the letter was a private matter between herself and her husband is simply unacceptable. She had a duty to Senior, as well as to the foundations of which she was a member and a trustee, to reveal this letter promptly after his death.
While hiding this information from the other trustees, she sought equitable aid from the court[13] to enjoin the adoption of amendments to the foundations' charters which would allow her removal as a lifetime trustee, to declare that she had lifetime *384 tenure as a trustee, surcharge Seward for sponsoring the amendments to the charters, appoint a receiver because the foundations' activities violated the charters and were causing great loss (presumably referring to the investment portfolio), and appoint a custodian to "ensure that the charitable purposes intended by the founder of the foundations are carried forth and executed faithfully to his intent, including proper financial management."
A basic maxim of equity is "One who comes into equity must come with clean hands." See A. Hollander & Sons v. Imperial Fur Blending Corp., 2 N.J. 235, 246 (1949). Usually applied to a plaintiff, this maxim means that a court of equity will refuse relief to a party who has acted in a manner contrary to the principles of equity. Plaintiff has not maintained these claims against Seward and the foundations in good faith. Her protestations that she seeks no award of damages, but only to have the foundations reimbursed and made whole, are disingenuous. by failing to inform her co-trustees of a significant right to receive some of the estate's assets, she breached her fiduciary duties in order to promote her interests in the New York litigation. Therefore, to whatever end her claims are made for her benefit, they are dismissed as being brought in bad faith with unclean hands.
The clean hands doctrine is based on public policy, and it may be relaxed in the interest of fairness. Rasmussen v. Nielsen, 142 N.J. Eq. 657, 661 (E. & A. 1948). The Attorney General of New Jersey was notified of this action and he intervened, as a plaintiff, pursuant to his common law supervisory obligations regarding charities. See Passaic Nat'l Bank v. E. Ridgelawn Cemetery, 137 N.J. Eq. 603, 608 (E. & A. 1945); In re Pfizer, 33 N.J. Super. 242, 264-265 (Ch.Div. 1954), aff'd 17 N.J. 40, 110 A.2d 54 (1954). In order to protect the public interest, the court will analyze the evidence to determine whether there were any improprieties in the management of the *385 foundations' assets. It is the Attorney General, rather than Mrs. Johnson, that the court considers to be the plaintiff.

The Standard of Care.
If he had held himself out as a professional investment adviser, Seward would have been required to exercise "that degree of care, knowledge and skill ordinarily possessed and exercised in similar situations by the average member of the profession practicing in his field." Cf. Erlich v. First Nat. Bank of Princeton, 208 N.J. Super. 264 (Law Div. 1984).
However, Seward was never considered by anyone to be acting as an independent, professional investment adviser. He is to be held accountable only to the standard of care applicable to trustees of a charitable foundation. In that respect, the court must examine the asset investment decisions he made while chairman of the finance committee or investment manager. The standard applicable to a charitable corporation, such as these foundations, is one of ordinary care. It is defined in the Uniform Management of Institutional Funds Act at N.J.S.A. 15:18-20:
In the administration of the powers to appropriate appreciation, to make and retain investments, and to delegate investment management of institutional funds, members of a governing board shall exercise ordinary business care and prudence under the facts and circumstances prevailing at the time of the action or decision. In so doing they shall consider long and short term needs of the institution in carrying out its ... charitable ... purposes, its present and anticipated financial requirements, expected total return on its investments, price level trends, and general economic conditions.
The New Jersey Nonprofit Corporation Act also applies to the foundations, and it provides, at N.J.S.A. 15A:6-14:
Trustees and members of any committee shall discharge their duties in good faith and with that degree of diligence, care and skill which ordinarily prudent persons would exercise under similar circumstances in like positions.
in Midlantic Nat'l Bank v. Frank G. Thompson Foundation, 170 N.J. Super. 128, 137 (Ch.Div. 1979), the court found that, pursuant to N.J.S.A. 15:18-15 to-24, a foundation director's responsibilities "are to be considered more under the developed law of corporations than of trusts" in the field of investment *386 management. Therefore, the stricter standard of the fiduciary, as applied to the trustee of a trust, is inapplicable here where a trustee is the statutory equivalent of a corporate director.[14] From corporate law, defendants urge the application of the "business judgment" rule. Under that rule, the court examines the director's or officer's good faith, and whether he made an informed decision based on a rational belief that the corporation would be benefited. See, e.g., Papalexiou v. Tower West Condominium, 167 N.J. Super. 516, 527 (Ch.Div. 1979). This rule was applied in the Midlantic case also. As applied, however, it means nothing more than the terms of N.J.S.A. 15A:6-14, quoted above, requiring comparison to the ordinary prudent person in similar circumstances.

Proof of Negligence.
Professor Roger F. Murray, plaintiff's expert in finance, opined that Seward acted imprudently in creating a bad stock selection system in failing to adhere to that system, use the technique of fundamental security analysis, seek more varied professional advice, use more than one stock broker and in failing to provide for proper self-evaluation. Murray's theory was simply that an investment manager of a $100 million charitable foundation must perform in a certain way, and Seward failed to do so. This testimony failed to carry plaintiff's burden of proof and was not convincing.
Murray is an advocate of fundamental security analysis. He is an apostle of Graham & Dodd and is editing the next edition of their textbook[15] which is generally considered to be the bible of fundamental analysis. In his opinion, one should not invest in a company without first analyzing the company itself and all *387 its economic attributes and related measures of value; one then buys or sells the stock of that company depending on the difference between the market price and the measured value of the company. Professor Murray's expertise in this field is well recognized and he obviously knows the intricacies of security analysis. But he has had his bad years, too, as a manager of part of the common fund, just as Benjamin Graham did when he continued to maintain large stockholdings in an insurance company which was losing tens of millions of dollars and threatened with bankruptcy.[16] If fundamental analysis were the only basis on which the ordinarily prudent person would select a common stock to buy or sell, then Murray's criticisms would be valid. Under that condition, it would be proper to conclude that defendants' investment-selection system was improperly designed. His fervor, however, is not convincing. Selection based on relative strength of the price of one company's stock compared to another's is also acceptable according to Carl Schafer and Professor Thaler. They say there is a controversy as to whether one can expect to make a short-term gain based on the recent history of performance ahead of the market averages, but the methodology is still reasonable and acceptable.
The stock buy-sell selections were almost always made according to the system, although there were deviations. In one instance, by changing two rules, Seward and Senior bought energy stocks but held them so long that unrealized gains were lost. By and large, Seward and Senior consulted frequently about buying and selling activities. Sometimes they disagreed, but they had a great deal of information available to assist in these buy-sell decisions, and given that, their actions were not unreasonable. No specific professional advice was sought, which Murray thought negligent, but all of the research of *388 Merrill Lynch was available, and a great deal of it was delivered to the foundations and was reviewed by Seward. He and Senior also read the Wall Street Journal and the New York Times to keep abreast of developments. Considering all of the testimony, the court is persuaded that Professor Thaler was correct in stating that there is no evidence that the lack of a financial professional contributed to or was the cause of the losses during the end of 1983 and in 1984.
The use of only one stock broker was criticized because it meant that the foundations lost the research and insight of a specialist which could be purchased with "soft dollars," that is, as a by-product of commission payments. Plaintiff failed to show, however, that Merrill Lynch could not provide such information, and the fact is that it did supply a great deal of information and computer aid with "soft dollars." Using just one broker is not unreasonable per se, as Schafer testified that two of the investment managers employed by Princeton University use one broker exclusively.
Murray also was of the opinion that Seward was negligent because he did not have a means of self-evaluation upon which he could gauge results. But the equity progress reports were prepared daily from the Merrill Lynch computers, and they contained the information relating to the popular indexes usually used for comparison. There was not enough information going to the board of trustees, however, and the members should have insisted on more frequent reporting. The reports which were distributed quarterly and annually were sufficient, but the June 1983 report was not mailed to the trustees promptly after it was prepared. The year-end report only covered eleven months when it was presented to the trustees. The 1984 annual report remains incomplete, supposedly because of the interruption caused by this litigation. These criticism are insufficient to support the burden of proving negligence.
James Miller, an experienced securities analyst and portfolio manager, now a supervisor of many portfolios for the trust *389 department of Mellon Bank, offered the opinion that Seward was not negligent, but should have been replaced immediately after the extent of the 1983 loss in portfolio value was known. Miller used the S & P 500 index as a standard, and he believed that any fiduciary (by which he meant a trust officer) who did not perform at least as well as that index should be discharged. He thought it was fair to compare the foundations' portfolio to the S & P 500, because he thought Seward had unlimited discretion in deciding what to buy or sell. But Miller had no idea of any of the foundations' objectives. For example, he was unaware of their practice of keeping 40%-45% in cash or cash equivalents during the year; he did not know that before 1983 the cash was used for federal income tax payout requirements at the end of the year; and he knew of no significant constraints on Seward as a manager. He assumed that Arthur Andersen & Co. was completely professional, and since they never sent him an equity progress report, he did not believe such a report existed.
After learning of the limits created by the application of the fundamental screens and other system rules, he agreed that in concentrating on lower risk type securities, the expected rate of return would be decreased. When considering that along with the great cash needs, he agreed that the S & P 500 would not be a fair measure of performance of the foundations' investment portfolio.
Miller observed the high annual turnover statistics, but he only criticized the turnover for those years when the results were bad. That is, he was not critical of 760% turnover in 1981 nor of 1300% turnover in 1982. He was unable to relate the rate of return to performance under any theory except to say that it meant excess transaction costs which reduced gain. That criticism carries no weight as it is patently obvious and is founded on hindsight.
His basic opinion was that the trustees were negligent for not replacing Seward as their investment manager. He did not *390 believe Seward or the trustees should be surcharged for any losses, but he was emphatic that Seward should have been replaced in the first few weeks of 1984. To accomplish that, the trustees should have retained a consultant in one month's time and have that consultant bring on new money managers in very short order. This concept is entirely unsuitable for these foundations, because the family background and long domination by Senior mandated a thorough examination of any potential outside manager. Miller's opinions concerning performance were not at all persuasive. In this case, it would have been entirely unreasonable for the trustees to act in the precipitous manner he prescribed, because the potential for disruption would have been obvious.
Professor Richard Thaler, defendants' expert in decision-making, looked to the process involved in three decisions made by the defendants: (1) managing the portfolio in-house without hiring a professional investment manager, (2) adopting the specific investment system utilized in this case and (3) maintaining the system after the poor results of 1983. He defined negligence as the making of an unreasonable or irrational decision. His thesis was that a decision based on information known at the time the decision was made can be evaluated as good or bad without regard to the outcome. In that way the evaluation is not biased by hindsight. In evaluating the three decisions, he considered the objectives of the decision-maker, the constraints put on the decision-maker, and the environment in which the decision was made.
The proffer of such expertise by defendant is very imaginative. Thaler's analysis and opinions are soundly based on the statutory standards of care set forth above, as well as on considerable academic training.[17] The court finds that plaintiff did not prove negligence by the preponderance of the expert *391 testimony, and even though the standard is ordinary business care and prudence, the field of finance is such that expert testimony is most helpful. The court believes Thaler's opinions are correct, and concludes, therefore, that Thaler's testimony undercut the plaintiff's theories to such an extent that she has not met the burden of proof.

(a). Adoption and implementation of the system.
The most significant influence impacting on Seward's function as investment manager was his father. Senior had been a successful captain of industry at Johnson & Johnson, and he was the creator and an ever-continuing presence in the operation of the foundations. Almost until his death, Senior remained the chairman of the board and the class A trustee. Then, too, Senior was Seward's father and, as such, exercised psychological control  a further constraint on Seward.
From 1979 to 1983, Seward constantly had to take into consideration a part of the Internal Revenue Code which required a charitable foundation to spend the greater of a certain percentage of the value of its investments, or all of its income, including tax-exempt interest and short-term capital gains.[18] He was guided by the controller's calculations of the payout requirement under various investment scenarios. These calculations affected the expenditures of the foundations, and acted as a constraint on the investment activities. That is, he had to decide whether to keep a stock considered ripe for sale or to incur an additional payout requirement. One method he used to defer recognition of gains in such a stock was to buy so-called "deep money options." Approval from the Internal Revenue Service and advice from the foundations' counsel, Shearman & Sterling, were received before adoption of the options investment program.
*392 To meet the payout requirements and other budgetary needs, the controller followed a practice of retaining a significant amount of cash equivalents. Thus the investment portfolios had an average of 40%-45% invested in cash or cash equivalents. Payout considerations were most critical at year-end, when Seward and the controller conferred daily. That also explains why the cash balances on the year-end financial statements were much lower than the average cash position.
At the same time, Senior had an emphatic belief in strength; he did not like to hold a stock whose strength was failing. Seward had to accept that constraint on his decisions regarding the degree of market exposure. Senior did not like financial service industries, such as banks, instead preferring manufacturing companies. These desires also acted as a constraint upon Seward's activities as investment manager. Additionally, Senior wanted Seward to manage the portfolio, without hiring a professional investment manager, and that also was a constraint.
Most academics in the field of finance advocate a combination of the random walk and the efficient market theories. Most Wall Street professionals, the security analysts and portfolio managers, disagree. The academics say that the stock market is self-regulating as it reacts to new information, and random selection of investments will follow the market. The most dramatic example was the Forbes index, composed of twenty stocks chosen by throwing darts at a list of securities on the stock exchange. Professor Thaler and others believe that profits can be made from cracks in the efficient market, and the relative strength theory is another gloss on the random walk-efficient market theories. It has been supported, as well as criticized, in the literature. See Robert A. Levy, "Random Walks: Reality or Myth," Financial Analysts Journal 69-77, (Nov.-Dec. 1967) and Frank C. Jen, "Discussion," Journal of Finance 495-499. (May 1970).
*393 Murray criticized the system used by Seward for not taking into account the volatility of each stock in which the foundations invested. He said Seward should have examined the beta coefficient, which characterizes the relationship between a stock's performance and the market averages. But Thaler said that financial studies mixing Beta considerations with relative strength rankings show lower returns than were expected.

(b). Reaction to the 1983-84 portfolio losses.
The first sign of trouble was in the summer of 1983, when large short-term losses were apparent to Seward. He spoke to the account manager at Merrill Lynch and to the foundation financial staff about the application of the system and the cause of the losses. In the fall there was a run-up in prices, but by the end of the year there were additional losses, so there was reason to be concerned. The trustees decided to keep the system intact, put Carl Schafer on the board and hire him as a consultant with regard to the retention of the system. Miller would have immediately retained a consultant to hire an outside portfolio manager, but Thaler said the trustees' decisions were good ones. In Schafer, the trustees had a familiar consultant who had worked the previous year with Harbor Branch Institute. He had superior credentials with a local institution, and he had experience with many different types of investment advisers. Thaler was of the opinion that the decision to rely on Schafer and not make a hasty change was prudent, and that Schafer's advice was also prudent. Murray opined that the 1983 losses were predictable and caused by investing in a large number of companies rated below average by Standard & Poor's; but, as Thaler noted, this analysis was invalid because stocks rated below average in 1983 performed very well. The court is convinced that Thaler was correct and Miller and Murray were not.
Later in 1984 Schafer was aware that the portfolio was still losing value and underperforming the market. He believed the relative strength concept was correct, but he was concerned *394 with the market timing decisions. In February and March, Schafer advised Seward to continue as he had been doing. When the litigation began to get active, however, Schafer thought that he and Seward would always be subject to criticism, regardless of the result. Both Schafer and Seward spoke about this every week, and by August, they decided to place some assets with outside managers. The litigation slowed down the decision-making process, and delayed the retention of PrimeCAP. Schafer's concern about foreign investments and certain changes in personnel delayed the negotiations with the Templeton company. Thus, although Seward had converted most of the assets into cash, he was unable to send any money out to these other managers until December.
During 1985, continuing to take Schafer's advice, the foundations placed the entire portfolio, except $10 million, with outside managers. Although it was not imprudent for the finance committee to delay reinvestment with these outsiders until satisfied of their ability to operate in accord with the foundation investment policies, the delay restrained the performance for 1985. This is illustrated on TABLE 2, infra.

*395
 TABLE 2.
 1985 PERFORMANCE OF COMBINED FOUNDATION PORTFOLIOS.
 Market Div/Int Dollar
 Value Realized & Weighted
 12/31/85 Unrealized Annual
 Gain/Loss Return
------------------------------------------------------------------------
Internally managed $20,881,747 $3,736,203 11.3%
Scudder Stevens $5,419,025 $1,304,111 14.2%
Templeton $6,004,346 $1,035,406 61.9%
Vanguard $58,515,075 $10,265,076 27.9%
YEAR-END RESULTS $90,820,193 $16,340,796 20.2%
1985 S&P Return 31.7%
1985 SEI Median Manager 25.4%
------------------------------------------------------------------------

(c). Conclusion as to negligence.
The evidence presented in this case does not prove that any one theory constitutes the standard against which negligence is to be measured. Rather, it proves that it was necessary for the trustees, the finance committee and Seward (whether they are viewed as separate entities or as just Senior and Seward or as only Seward) to choose an investment system which would satisfy their objectives while subject to their perceived constraints. It was prudent to design a mechanical system, based on a recognized theory of investment, which routinized the identification of investment targets reflecting the goal of buying strength. It would have been a bad decision and imprudent to have a system based on fundamental security analysis, if that system had to be operated by Seward, because of his lack of formal training.[19]
*396 Schafer and Thaler have convinced the court that defendants acted prudently in 1983-1984 when the portfolio was suffering serious losses. Before that time, the performance was such that there can be no thought of negligent management. The changes in value were never so far from that of the median investment manager for large institutions, as measured by the SEI index, that the plaintiff could prove that Seward was imprudent, even by looking only to result after the fact. In hindsight, one can also observe that in 1983-1984, most of the money managers for large institutions underperformed the market averages. Such comparisons are relevant, because one must remember that investment performance is always measured against a market index. But those indexes each have a particular bias, and can at best be considered just a guide, rather than a fixed standard, in determining whether there is negligence in performance or damages caused thereby. Hindsight, as a measure of prudent behavior, is inappropriate because the stock market is inherently unpredictable.
The court concludes, therefore, that plaintiff failed to prove ordinary negligence by the greater weight of the believable evidence.

(d). Future Investment Management.
The Attorney General takes the position that because of the poor performance in 1983-1984, the court should order the foundations to use "professional portfolio managers to actively manage the[ir] assets," replace Seward as chairman of the Finance Committee with Schafer or someone of equal experience and stature, replace James Johnson on the Finance Committee with a successful, experienced, trained person in the *397 field of investment management, and monitor performance of the foundations' investments "for a limited period." He also asks the court to give special instructions to the outside portfolio manager "to insure that any brokerage commissions or fees to be paid by the foundations in the future are reasonable and do not exceed the fees customarily paid by investors similarly situated to the two foundations."
This position was not presented until after the trial but before the 1985 performance figures were presented to the court.[20] The 1985 performance shows two of the three outside managers underperformed the S & P 500 and one was far below the SEI index. Internally managed funds cannot be fairly compared to these indexes because two-thirds of the income was from dividends and interest and one-third from sales of the balance of the portfolio left at the end of 1984. At the present time, the foundations hold almost all cash and intend to continue that position. Under the circumstances, the rate of return of 20.2% compares favorably with the S & P 500 at 31.7% and the SEI at 25.4%, both measuring a full year's performance.
Some literature indicates that the relative strength system employed by defendants is useful only during certain phases of the market cycle, to wit, during a rising market and not during and following periods of market weakness. It has also been said that, "[i]t would be unfair and misleading to assert that any one stock selection system is always the right one or the wrong one. No one ever said that speculation and investment was easy. In the final analysis, an integrated market timing and stock selection system should be incorporated into an *398 overall portfolio strategy." Fosback, Stock Market Logic, supra at 200-201. The board of trustees and the finance committee should bear this in mind in evaluating the performance of any outside or inside portfolio manager.
It seems that the investment problem has been cured by placing the assets with outside managers, but the reporting methodology needs to be improved. The board of trustees should require each portfolio manager to provide quarterly time-weighted reports, and it should have its treasurer, Hewitt, match these with the SEI and S & P 500 indexes. Schafer should advise the board of the significance of these various reports, and the board should endeavor to maintain a high level of performance. The same standards should apply to any present or future internal management of stock market investments. James Johnson should consider the Attorney General's criticisms and assure the board that he is able to render conscientious service to the finance committee. There is no indication that the foundations are paying unusual brokerage commissions under the new management arrangements, nor was there any proof that the rates at which the commissions had been charged in the past were unusual.
Since there is no appearance of fraud or wrong-doing by any member of the board, there is no need to make reports to the Attorney General, the court or any outside agency. The court is satisfied to rely on the integrity of the board of trustees. If the Attorney General feels differently, he may, of course, make such investigation of these foundations, or any other charitable foundation, as he deems necessary in the exercise of his supervisory powers.

Conclusion.
The complaint is dismissed for lack of proof of negligence. The Attorney General is left to proceed administratively, in his discretion.
NOTES
[1] Hereinafter referred to as "Senior."
[2] Plaintiff characterizes Senior, in her verification affidavit, as "the principal and controlling Trustee of the two foundations, as well as being a director, officer and member of the executive committee of the Foundations."
[3] Hereinafter referred to as "Seward."
[4] Companies with annual sales less than $50 million, with a debt-to-equity ratio exceeding 65%, with a negative Merrill Lynch "Z Score" (indicating a likelihood of bankruptcy) and with a weekly trading volume less than $500,000 were screened out of consideration.
[5] Calculations of relative strength were made by Merrill Lynch and communicated to Seward each week.
[6] Sometimes, Senior would have him buy stocks of companies without the use of the computerized system.
[7] See, e.g., exhibit D-1 at trial.
[8] The figures for 1979 must be tempered by the fact that many Johnson & Johnson stock sales occurred then.
[9] Not yet available.
[10] The S & P 500 or composite index is said to be a basic representation of the market, because extensive historical data is available about the listed companies and because it is, in theory, fairly constructed. It has been criticized as not adequately reflective of the price changes of most of the traded stocks because it is weighted by equity capitalization. In the case at bar, its use must be tempered by the fact that it is an unmanaged index, without objectives, constraints or transaction costs. It is, however, the most popularly used index.
[11] The SEI funds evaluation service is a database of more than 3500 managed retirement funds, including the largest banks, insurance companies and investment professionals in the country. The median account return is defined as the midpoint of returns from a sample drawn from all the funds; the sample, therefore, represents performance of the "professional managers" of all the funds reporting to the database.
[12] Her attorney and co-executrix, Nina Zagat, esquire of Shearman & Sterling, witnessed the execution of this agreement, as well as the will which was subsequently disputed by Seward and his siblings.
[13] The verified complaint was filed on February 13, 1984, and the first amended complaint was filed March 2, 1984.
[14] A trustee is required to be cautious, as well as careful and skillful, in the investment of the trust assets. See Commercial Trust Co. v. Barnhard, 27 N.J. 332, 343 (1958).
[15] Graham, Dodd & Cottle, Security Analysis; Principles and Technique (4 ed. 1962).
[16] It seems that neither Graham nor the fundamentalists were aware of the situation, and thus wrongly evaluated the company. Fosback, Stock Market Logic 198 (1984).
[17] Case law, too, ties prudence to the circumstances extant at the time in question, rather than as they may appear in hindsight. See Bankers Trust Co. v. Bacot, 6 N.J. 426, 441 (1951).
[18] Failure to make a proper distribution would subject the foundation to a penalty tax of 15% of undistributed income. Internal Revenue Code (1982) § 507(c).
[19] The fundamental screens mechanically eliminated 80% of all common stocks on the market, and 90% of those left were eliminated by the relative strength rankings.
[20] The last day on which testimony was taken was February 6, 1986. Written summations were supposed to arrive every two working days thereafter. Due to illness in the office, the Attorney General's summation arrived February 25, 1986. Then the court wanted to see the 1985 performance statistics, so additional testimony was taken from the foundations' treasurer on February 27, 1985.