**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1778-22

A.K.,[1]

      Plaintiff-Respondent/
      Cross-Appellant,

v.

S.K.,

      Defendant-Appellant/
      Cross-Respondent.

_____

      Argued October 16, 2024 – Decided January 29, 2025

      Before Judges Gooden Brown and Chase.

      On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Atlantic County, Docket No. FM-01-0510-15.

      Michael Confusione argued the cause for appellant/cross-respondent (Hegge & Confusione, LLC, attorneys; Michael Confusione, of counsel and on the briefs).

---

[1] We use initials to protect the identity of domestic violence victims, and to preserve the confidentiality of those proceedings. R. 1:38-3(d)(9), (10).

David A. Castaldi argued the cause for respondent/cross-appellant (Jacobs & Barbone, PA, attorneys; Edwin J. Jacobs, Jr. and Joel S. Juffe, on the briefs).

PER CURIAM

In this post-judgment dissolution matter, defendant/ex-wife appeals and plaintiff/ex-husband cross-appeals from orders entered following a twenty-three-day plenary hearing that resulted in a sixty-two-page written decision and subsequent orders entered in the Family Part. Specifically, defendant appeals from the denial of her Rule 4:50-1 motion to vacate a property settlement agreement (PSA) that was ultimately incorporated into a default final judgment of divorce (JOD). The judge denied the motion on both procedural and substantive grounds. Plaintiff cross-appeals from the judge's rulings allocating credit card debt, equitably distributing an automobile, and denying an award of counsel fees and sanctions. Based on our thorough review of the lengthy record and applicable legal principles, we affirm for the reasons stated in the judge's comprehensive written opinion in which the judge made copious factual findings and drew sound legal conclusions.

I.

We glean these facts from the lengthy hearing during which the parties testified and each produced several witnesses. The parties met in 2002 while

2

defendant was working as a casino dealer and plaintiff was a well-known high roller. At the time, plaintiff was fifty-eight years old, and defendant was thirty-two. Plaintiff was an attorney who no longer practiced law and a real estate developer with a net worth of $30 million that included real estate holdings consisting of multiple homes and business ventures. Defendant was born in Vietnam, had immigrated to the United States at age eleven, and had worked in the casino industry since 1992.

They married in 2004 and lived a lavish lifestyle. Plaintiff gave defendant expensive gifts, including jewelry and pocketbooks valued at $1 million. In 2008, the real estate market was declining, and plaintiff retained a Maryland law firm to prepare an "asset protection and restructure plan" (the asset protection plan) to protect his assets. Essentially, the asset protection plan consisted of plaintiff transferring to defendant all his assets, including bank accounts, cash, and real estate. Some of the assets were transferred to holding companies such as STL Development LLC (STL) and ST2K, LLC (ST2K), which companies were eventually transferred to defendant. In turn, on December 3, 2008, defendant executed a power of attorney (POA) in favor of plaintiff, providing him with access to the assets.

3

In 2012, plaintiff filed for Chapter 11 bankruptcy, believing that the asset protection plan would shield defendant and the properties held in her name from the bankruptcy. However, in 2013, the bankruptcy court converted plaintiff's application to a Chapter 7 proceeding, finding that plaintiff borrowed funds without the bankruptcy court's approval, treated income as his own rather than depositing it in the proper accounts, and lacked credibility. The bankruptcy court also deemed the asset protection plan a "fraudulent conveyance" because it had occurred within the four-year look-back period from the date plaintiff had filed for bankruptcy. As a result, the bankruptcy court included in the Chapter 7 proceeding all assets held in defendant's name, including STL and ST2K.

Based on the "fraudulent conveyance" accusation, plaintiff hired Eric Browndorf of Cooper Levenson, PA, (CL) to represent him. On July 19, 2013, CL mistakenly sent a retainer agreement addressed to both plaintiff and defendant for services provided by Browndorf. Browndorf later confirmed that it was a clerical error to include defendant's name on the retainer agreement because he only represented plaintiff and had never spoken to defendant. Although defendant wrote the checks to CL and claimed that Browndorf represented her as well as plaintiff, she ultimately acknowledged that Anthony Saccullo, a Delaware attorney, represented her with respect to the fraudulent

4

conveyance accusation. An email exchange between the parties, Browndorf, and Saccullo, as well as an invoice from Saccullo addressed to defendant, confirmed that defendant was aware that Saccullo represented her.

While the bankruptcy proceedings were pending, plaintiff discovered that defendant had an extramarital affair. Defendant made the disclosure to plaintiff when her lover filed a criminal complaint accusing her of stealing cash and other items from his home.[2] On the advice of counsel, plaintiff delayed filing for divorce until the bankruptcy proceedings were completed. However, in anticipation of a divorce, the parties signed a mid-marriage agreement (MMA) that was later incorporated into a PSA.

Richard Klein, another CL attorney, represented plaintiff in the matrimonial matter. Klein prepared the MMA in December 2013 and the PSA in January 2014. Under the MMA, the parties acknowledged the bankruptcy proceedings and "delineate[d] and confirm[ed] their property rights" as well as their intention "to avoid contested litigation relating to the . . . properties and entities previously transferred to [defendant]." The MMA specifically identified the property subject to the agreement as certain real estate holdings as well as interests in STL and ST2K. The parties agreed that each had "disclosed to the

---

[2] The criminal complaint was later dismissed.

5

other all relevant information" regarding marital assets, and defendant agreed to execute a POA in favor of plaintiff, permitting plaintiff to have control over the assets previously transferred to her, including those held by STL and ST2K. In exchange, plaintiff agreed to hold defendant harmless and indemnify her from all claims, including any claims arising from the criminal complaint filed against defendant by her lover.

The MMA further provided that its terms would be incorporated into any PSA executed by the parties, and specifically provided that defendant did not waive any of her rights under the divorce laws of New Jersey. The MMA also stated "the parties consider[ed] this to be a binding [a]greement . . . entered into freely[,] . . . voluntarily and willingly," and that the terms were "fair and equitable in full recognition and extent of each party's assets." Although the MMA expressly referred to defendant's option to seek counsel to advise her, by entering into the MMA, she "voluntarily and knowingly . . . elected to waive said advice." On December 5, 2013, both parties signed the MMA, which was duly notarized by a notary public. On the same date, defendant signed a POA in favor of plaintiff.

The PSA incorporated the MMA. Among other things, the PSA provided that each party waived alimony "for now and for all time, despite substantial

changes in their monetary circumstances." Under the PSA, defendant would receive a 2010 Mercedes Benz valued at $55,000, and $200,000 in equitable distribution upon the entry of a JOD. Pursuant to the PSA, each party would retain their personal property but defendant expressly waived her right to any other assets "that she may have by way of equitable distribution," including any "assets related to" the bankruptcy action and to any ownership in STL and ST2K. In exchange, plaintiff would hold defendant "harmless with regard to any liabilities of any nature which may stem from said bankruptcy proceeding." Additionally, plaintiff would reimburse defendant's mother $57,000. The PSA also specified that plaintiff would be "fully and solely responsible for any and all counsel fees and costs incurred by [defendant]" in connection with the negotiation of the PSA and would indemnify defendant's counsel fees for the handling of the criminal complaint. However, if a party was forced to expend additional counsel fees as a result of the other party's non-compliance with the terms of the PSA, the violator would pay the non-offending party's fees.

Critically, the parties acknowledged that the provisions of the PSA were "fair, adequate, and satisfactory," and it was "being entered into voluntarily" and "not the result of any duress or undue influence exercised by either party upon the other or by any other person." Defendant acknowledged that she was "fully

7

advised of her right to counsel" but "knowingly and intelligently waived her right."  Under the "Voluntary Execution" provision, the PSA stated:

> [Defendant] knowingly, willingly and voluntarily has waived her right to counsel and acknowledg[es] that the [a]greement is fully consistent with her wishes and requests.  [Defendant] fully acknowledges that she has proceeded in this matter on a pro se basis but has participated fully in the negotiation process, including being advised by counsel with regard to the negotiation of the terms of the [MMA] which included disclosures of assets and liabilities as set forth in this agreement.

The parties signed the PSA on January 17, 2014, and it was duly notarized by a notary public.

On September 2, 2014, defendant deposited a check for $200,000 drawn on plaintiff's Bank of America (BOA) account.  In December 2014, the bankruptcy court approved a global settlement agreement and plaintiff received between $4.6 and $4.8 million in the global settlement.  After the global settlement, plaintiff relied on gambling for income, earning $528,408 in 2014 from poker winnings.[3]

On January 13, 2015, plaintiff filed a complaint for divorce.  On the same day, defendant signed a waiver of her right to file an answer to the divorce

---

[3]  Plaintiff's gambling winnings for the prior four years were $38,785 in 2010, $42,245 in 2011, $60,889 in 2012, and $41,722 in 2013.

complaint. On February 21, 2015, defendant received notification of the hearing date for the divorce and signed the return receipt card. Although she later admitted receiving the notification, defendant claimed she received the notice on February 21, 2013, not 2015.

On February 20, 2015, Klein filed a request to enter default judgment against defendant. At the ensuing March 18, 2015, divorce hearing, Klein relied on defendant's failure to file pleadings or appear at the divorce hearing to support his request for the entry of a default judgment. In questioning plaintiff under oath regarding the voluntariness of his decision to be bound by the PSA submitted at the hearing, Klein declared in court that an attorney had reviewed the PSA on defendant's behalf. Plaintiff affirmed Klein's declaration.

After the hearing, the trial court[4] entered a default final judgment of divorce, incorporating the PSA. Although the court heard no testimony and made no findings regarding the fairness of the PSA, the court found that each party had been advised of their right to be represented by counsel; that "while not . . . represented by counsel of record, [defendant] did have an attorney review the agreement on her behalf"; and that each party had entered into the agreement

---

[4] The judge was not the same judge who conducted the plenary hearing.

"voluntarily without coercion or duress." No case information statement (CIS) was filed by either party in connection with the divorce.

After the divorce, the parties filed multiple malpractice actions against the attorneys who had represented them in the bankruptcy proceedings. They also continued to live together for the next two years and to vacation together. Although defendant later claimed she was not aware of the divorce until spring of 2017, her actions belied her claim. For example, during a deposition in one of the malpractice lawsuits, she conceded she was divorced. She also filed for benefits in Pennsylvania in November 2014, listing her marital status as "Single/Never Married."

In 2016, plaintiff purchased a white 2017 Lexus for approximately $52,000. Initially, according to plaintiff, defendant said she would pay him for the car, so he signed the title over to her. However, he later claimed that defendant stole the car's title from his home and forged the words "husband to wife" on the title. As for the 2010 Mercedes allocated to defendant in the PSA, defendant stated she had sold the car prior to the entry of the JOD for approximately $20,000. Plaintiff confirmed in a certification that the Mercedes was no longer in the possession of either party as of October 2016.

A-1778-22

On August 9, 2017, while they were still living together, defendant paid her BOA credit card bill of $15,459.21 using plaintiff's BOA bank account. Plaintiff disputed the charge and BOA credited plaintiff's account with the disputed amount after conducting an investigation. According to defendant, after the bankruptcy, plaintiff was not able to get his own credit card so he generally used her BOA credit card and customarily paid the bill each month.

Shortly thereafter, a temporary restraining order (TRO) was issued against plaintiff on defendant's behalf and law enforcement removed plaintiff from the home they were sharing. Plaintiff responded by filing a motion to enforce litigant's rights, seeking to enforce certain terms of the PSA. Defendant opposed the motion and cross-moved for the return of $15,459, the amount due on her BOA credit card. Subsequently, on October 27, 2017, defendant moved to set aside the JOD, requesting Rule 4:50-1 relief on the ground that the PSA was unconscionable. After denying cross-motions for summary judgment,[5] a plenary hearing was conducted between May 2021 and February 2022.

Following the hearing, on July 22, 2022, the judge entered an order and accompanying written decision denying defendant's request for Rule 4:50-1

---

[5] In adjudicating the summary judgment motions, the judge ordered plaintiff to pay defendant over $30,000 in counsel fees and sanctions for violating court orders.

A-1778-22

relief. The judge ruled that defendant's motion was not filed within a reasonable time and, in any event, the JOD was not unconscionable in substance or in procedure. Although the judge granted, in part, plaintiff's motion to enforce litigant's rights, the judge also ordered plaintiff to reimburse defendant $15,459 due on her BOA credit card, and ruled that defendant should retain the 2017 Lexus in lieu of the 2010 Mercedes contemplated in the PSA.

Both parties moved for reconsideration, which was largely denied in a September 8, 2022, order.[6] The judge also denied the parties' subsequent cross-motions for counsel fees and sanctions in a January 10, 2023, order. In an accompanying written decision, the judge determined that it would be inequitable to award fees to either party. The judge found that although both parties had "litigated aggressively and vigorously" and had been granted relief, each party had acted in bad faith and lacked credibility. The judge also concluded that sanctions were not justified under Rule 1:4-8 because plaintiff did not send a safe harbor notice to defense counsel prior to the hearing. These cross-appeals followed.[7]

---

[6] The judge partially granted plaintiff's reconsideration motion on an issue defendant has not raised in this appeal.

[7] In response to defendant filing an appeal, plaintiff sent three safe harbor letters, warning defendant that her appeal was filed in bad faith.

II.

In her appeal, defendant argues the judge erred in denying Rule 4:50-1 relief on both procedural and substantive grounds. Defendant asserts "there was fundamental unfairness to [her] in the process" leading to the entry of the JOD and, as a result, "the equitable distribution and alimony provisions" of the JOD should be vacated "in this high value divorce case." Among other things, defendant asserts the process was tainted by plaintiff's fraudulent representations and controlling behavior, as well as the enforcement of an MMA "that New Jersey law provides is inherently coercive and generally unenforceable."

Motions to set aside a judgment are governed by Rule 4:50-1, which provides as follows:

> On motion, with briefs, and upon such terms as are just, the court may relieve a party or the party's legal representative from a final judgment or order for the following reasons: (a) mistake, inadvertence, surprise, or excusable neglect; (b) newly discovered evidence which would probably alter the judgment or order and which by due diligence could not have been discovered in time to move for a new trial under R. 4:49; (c) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (d) the judgment or order is void; (e) the judgment or order has been satisfied, released or discharged, or a prior judgment or order upon which it is based has been reversed or otherwise vacated, or it is

no longer equitable that the judgment or order should have prospective application; or (f) any other reason justifying relief from the operation of the judgment or order.

"We review a motion under Rule 4:50-1 to vacate final judgment under an abuse of discretion standard." 257-261 20th Ave. Realty, LLC v. Roberto, 477 N.J. Super. 339, 366 (App. Div. 2023) (citing U.S. Bank Nat'l Ass'n v. Guillaume, 209 N.J. 449, 467 (2012)). "Although the ordinary abuse of discretion standard defies precise definition, it arises when a decision is 'made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002) (internal quotation marks omitted) (quoting Achacoso-Sanchez v. INS, 779 F.2d 1260, 1265 (7th Cir. 1985)). "[A] functional approach to abuse of discretion examines whether there are good reasons for an appellate court to defer to the particular decision at issue." Ibid. "However, if a judge makes a discretionary decision but acts under a misconception of the applicable law or misapplies the applicable law to the facts," we "need not extend deference." Johnson v. Johnson, 320 N.J. Super. 371, 378 (App. Div. 1999).

"Rule 4:50-2 provides the time frame within which a motion seeking relief under Rule 4:50-1 must be filed." Romero v. Gold Star Distrib., LLC, 468 N.J. Super. 274, 296 (App. Div. 2021). The rule states "[t]he motion shall be made

14

within a reasonable time, and for reasons (a), (b) and (c) of R[ule] 4:50-1 not more than one year after the judgment, order or proceeding was entered or taken."

> This expressly means that motions under subsections (a), (b) and (c) must be filed within a "reasonable time" and "not more than one year after the judgment," [R. 4:50-2], while motions under subsections (d), (e) and (f) must be brought within a "reasonable time," which could be more or less than one year after the judgment, depending on the circumstances.
>
> [Romero, 468 N.J. Super. at 296.]

"The trial court has the discretion to consider the circumstances of each case, and in some instances a reasonable time may be less than one year." Ibid. (citing Orner v. Liu, 419 N.J. Super. 431, 437 (App. Div. 2011)).

Rule 4:50-1 is "designed to reconcile the strong interests in finality of judgments and judicial efficiency with the equitable notion that courts should have authority to avoid an unjust result in any given case." Baumann v. Marinaro, 95 N.J. 380, 392 (1984) (quoting Manning Eng'g, Inc. v. Hudson

<u>Cnty. Park Comm'n</u>, 74 N.J. 113, 120 (1977)). Here, defendant specifically relies on subsections (c) and (f) to support her claims for <u>Rule</u> 4:50-1 relief.[8]

Fraud under <u>Rule</u> 4:50-1(c) requires proof of: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the [fraudster] of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." <u>Banco Popular N. Am. v. Gandi</u>, 184 N.J. 161, 172-73 (2005) (quoting <u>Gennari v. Weichert Co. Realtors</u>, 148 N.J. 582, 610 (1997)). Fraudulent misrepresentation occurs when an individual purports to represent a fact when it is in fact false. <u>Jewish Ctr. of Sussex Cnty. v. Whale</u>, 86 N.J. 619, 624 (1981). Legal fraud or fraudulent misrepresentation must be established by clear and convincing evidence. <u>Stochastic Decisions, Inc. v. DiDomenico</u>, 236 N.J. Super. 388, 395-96 (App. Div. 1989).

---

[8] During oral argument before us, defendant appeared to cite subsections (c), (d), (e), and (f) to support her claims. However, her merits brief and argument before the trial judge were confined to subsections (c) and (f), thereby limiting her claims on appeal. <u>See</u> <u>Zaman v. Felton</u>, 219 N.J. 199, 226-27 (2014) (explaining the "well-settled principle that our appellate courts will decline to consider questions or issues not properly presented to the trial court when an opportunity for such a presentation is available" (quoting <u>State v. Robinson</u>, 200 N.J. 1, 20 (2009))); <u>see also</u> <u>Noye v. Hoffmann-La Roche Inc.</u>, 238 N.J. Super. 430, 432 n.2 (App. Div. 1989) (explaining that we need not decide an issue that the party did not brief, but raised for the first time during oral argument).

A-1778-22

A party alleging a fraud on the court must demonstrate that the party committing the fraud "set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense." Triffin v. Automatic Data Processing, Inc., 394 N.J. Super. 237, 251 (App. Div. 2007) (quoting Aoude v. Mobil Oil Corp., 892 F.2d 1115, 1118 (1st Cir. 1989)). "Unlike common law fraud on a party, fraud on a court does not require reliance." Ibid.

"[R]elief from judgments pursuant to [Rule] 4:50-1(f) requires proof of exceptional and compelling circumstances." Harrington v. Harrington, 281 N.J. Super. 39, 48 (App. Div. 1995). In determining whether such exceptional circumstances exist to warrant relief, the court considers the following factors: "(1) the extent of the delay in making the application; (2) the underlying reason or cause; (3) the fault or blamelessness of the litigant; and (4) the prejudice that would accrue to the other party." Parker v. Marcus, 281 N.J. Super. 589, 593 (App. Div. 1995) (citing Jansson v. Fairleigh Dickinson Univ., 198 N.J. Super. 190, 195 (App. Div. 1985), superseded on other grounds by statute, R. 4:23-5). As such, "to establish the right to such relief," a party must show that

"enforcement of the order or judgment would be unjust, oppressive or inequitable." Harrington, 281 N.J. Super. at 48.

"Generally, a motion for relief from judgment based upon the grounds specified in Rule 4:50-1 should be 'granted sparingly.'" N.J. Div. of Youth & Fam. Servs. v. T.G., 414 N.J. Super. 423, 434 (App. Div. 2010) (quoting F.B. v. A.L.G., 176 N.J. 201, 207 (2003)). Nevertheless, default judgments are not favored in divorce litigation. Curry v. Curry, 108 N.J. Super. 527, 530 (App. Div. 1970). As a result, an application to vacate a default judgment, particularly in divorce litigation, is "viewed with great liberality, and every reasonable ground for indulgence is tolerated to the end that a just result is reached." Marder v. Realty Constr. Co., 84 N.J. Super. 313, 319 (App. Div. 1964). The requisite liberality, however, should be administered in accordance with Rule 4:50-1, and a default judgment, even with respect to divorce litigation, will generally "not be disturbed unless the failure to answer or otherwise appear and defend was excusable under the circumstances and unless the defendant has a meritorious defense." Franzblau Dratch, PC v. Martin, 452 N.J. Super. 486, 491 (App. Div. 2017) (quoting Pressler & Verniero, Current N.J. Court Rules, cmt. 4.1 on R. 4:50-1 (2018)).

A-1778-22

Defendant seeks to vacate the default judgment of divorce by attacking as unconscionable the settlement negotiated by the PSA and the MMA and incorporated into the JOD. "A settlement between parties to a lawsuit is a contract like any other contract, which 'may be freely entered into and which a court, absent a demonstration of "fraud or other compelling circumstances," should honor and enforce as it does other contracts.'" <u>Jennings v. Reed</u>, 381 N.J. Super. 217, 227 (App. Div. 2005) (citation omitted) (quoting <u>Pascarella v. Bruck</u>, 190 N.J. Super. 118, 124-25 (App. Div. 1983)). "New Jersey has long espoused a policy favoring the use of consensual agreements to resolve marital controversies." <u>Konzelman v. Konzelman</u>, 158 N.J. 185, 193 (1999). For this reason, in a divorce action, "fair and definitive arrangements arrived at by mutual consent should not be unnecessarily or lightly disturbed." <u>Smith v. Smith</u>, 72 N.J. 350, 358 (1977).

Still, "[m]arital agreements . . . are enforceable only if they are fair and equitable." <u>Massar v. Massar</u>, 279 N.J. Super. 89, 93 (App. Div. 1995).

> Any marital agreement which is unconscionable or is the product of fraud or overreaching by a party with power to take advantage of a confidential relationship may be set aside. <u>Guglielmo v. Guglielmo</u>, 253 N.J. Super. 531, 541 (App. Div. 1992); <u>Dworkin v. Dworkin</u>, 217 N.J. Super. 518, 523 (App. Div. 1987). In fact, the law affords particular leniency to agreements made in the domestic arena and similarly

19

allows judges greater discretion when interpreting these agreements. Guglielmo, 253 N.J. Super. at 542. Such discretion is based on the premise that, although marital agreements are contractual in nature, "contract principles have little place in the law of domestic relations." Ibid. (citing Lepis v. Lepis, 83 N.J. 139, 148 (1980)). Nevertheless, the contractual nature of such agreements has long been recognized and principles of contract interpretation have been invoked particularly to define the terms of the agreement and divine the intent of the parties. Capanear v. Salzano, 222 N.J. Super. 403, 407 (App. Div. 1988). In interpreting the agreement, the court will not draft a new agreement for the parties. Aarvig v. Aarvig, 248 N.J. Super. 181, 185 (Ch. Div. 1991).

[Massar, 279 N.J. Super. at 93 (citations reformatted).]

To demonstrate unconscionability to justify setting aside a contract, a party must "show[] some overreaching or imposition resulting from a bargaining disparity between the parties, or such patent unfairness in the contract that no reasonable person not acting under compulsion or out of necessity would accept its terms." Howard v. Diolosa, 241 N.J. Super. 222, 230 (App. Div. 1990). Determining unconscionability requires consideration of two factors: procedural and substantive unconscionability. Sitogum Holdings, Inc. v. Ropes, 352 N.J. Super. 555, 564 (Ch. Div. 2002). The former arises out of defects in the process by which the contract was formed and "can include a variety of inadequacies, such as age, literacy, lack of sophistication, hidden or unduly

complex contract terms, bargaining tactics, and the particular setting existing during the contract formation process." Muhammad v. Cnty. Bank of Rehoboth Beach, Del., 189 N.J. 1, 15 (2006) (quoting Sitogum Holdings, Inc., 352 N.J. Super. at 564). The latter "generally involves harsh or unfair one-sided terms." Ibid. (citing Sitogum Holdings, Inc., 352 N.J. Super. at 565).

Generally, mid-marriage agreements are unenforceable as they are "inherently coercive," entered into "before [a] marriage los[es] all of its vitality and when at least one of the parties, without reservation, want[s] the marriage to survive." Pacelli v. Pacelli, 319 N.J. Super. 185, 190-91 (App. Div. 1999). On the other hand, property settlement agreements prepared in contemplation of divorce are enforceable as they assume the parties stand in adversarial positions and negotiate in their own self-interest. Id. at 189-90, 195. In those circumstances, "knowing that the marriage is over, though one party may wish to continue it, each party can pursue his or her economic [self-interest]." Id. at 195.

To determine whether the parties reached a binding PSA, we must consider "whether there was sufficient credible evidence to support the trial court's findings." N.J. Div. of Youth & Fam. Servs. v. M.C. III, 201 N.J. 328, 342 (2010). Due to the special expertise required in family matters, we "defer

21

to the [family] court's determinations 'when supported by adequate, substantial, credible evidence.'" N.J. Div. of Child Prot. & Permanency v. Y.A., 437 N.J. Super. 541, 546 (App. Div. 2014) (quoting N.J. Div. of Youth & Fam. Servs. v. I.Y.A., 400 N.J. Super. 77, 89 (App. Div. 2008)).

"Deference is especially appropriate 'when the evidence is largely testimonial and involves questions of credibility,'" Cesare v. Cesare, 154 N.J. 394, 412 (1998) (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997)), because "[t]he trial court is best suited to assess credibility, weigh testimony and develop a feel for the case," Y.A., 437 N.J. Super. at 546. "Unless the trial judge's factual findings are 'so wide of the mark that a mistake must have been made' they should not be disturbed, even if we would not have made the same decision if we had heard the case in the first instance." Ibid. (quoting N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 279 (2007)). "Therefore, an appellate court should not disturb the 'factual findings and legal conclusions of the trial judge unless [it is] convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice.'" Cesare, 154 N.J. at 412 (alteration in original) (quoting Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 484 (1974)).

Applying these principles here, we discern no abuse of discretion in the judge's decision denying Rule 4:50-1 relief. At the outset, the judge acknowledged:

> [T]he court finds that defendant certainly did not obtain the amount of equitable distribution nor support which one would likely obtain in the vast majority of matters in which there are similar facts. But the court finds that this is not the standard it must follow. Essentially, in order for defendant to prevail she must prove by a preponderance of the credible evidence that the terms of the agreement were excessively disproportionate to her detriment and that such disproportionality was an exceptional and compelling circumstance which supports vacating the [JOD] and reinstating the case to a pre-judgment status. She also must show that the filing of her application based on substantive unconscionability was made within a reasonable period of time.

The judge concluded defendant's proofs were insufficient to warrant relief.

As a threshold matter, the judge found defendant's application for Rule 4:50-1 relief was not filed within a reasonable time. In that regard, the judge posited:

> The legal inquiry the court must decide is, [considering] the filing of . . . defendant's motion in October 2017, [were] the delay[s] of three years and eleven months from the date the MMA was signed in December 2013, three years and [ten] months from the date the PSA was signed, and two years and seven months from the date of the [JOD] reasonable periods of time under [Rule] 4:50-2?

The judge concluded that the two-year and seven-month delay between the entry of the JOD and the filing of defendant's motion "was unreasonable."

Instead of ending the inquiry with that determination as could have been done, the judge considered the merits and determined that the JOD was neither procedurally nor substantively unconscionable. In assessing credibility, the judge discredited most of defendant's testimony based on her demeanor while testifying, the testimony of other witnesses, and the documentary exhibits adduced at the hearing. According to the judge, defendant lacked credibility when she stated she signed the MMA and PSA without reviewing the documents, was unaware that she was divorced until the spring of 2017, and never received the divorce complaint or the certified letter notifying her of the divorce hearing.

The judge pointed out that defendant signed multiple legal documents post-divorce stating she was divorced. The judge found that these documents clearly established that defendant knew she was divorced in 2015, debunking her fraud allegations. Further, the judge noted that defendant admitted that her signature appeared on the notarized acknowledgement of service for the summons and complaint for divorce dated January 13, 2015. The judge found the document she signed clearly indicated that it was "a divorce pleading." Also, pointing to defendant's acknowledgement that she signed the return receipt card

24

dated February 21, 2015, notifying her of the divorce hearing scheduled for March of 2015, the judge characterized defendant's claim that she signed the card in 2013, and not 2015, as "simply an incredible assertion that the court finds astounding and incredible."

According to the judge, the fact that the parties continued to live and travel together after the divorce did not establish that defendant was defrauded into believing the parties were still married. Instead, the judge found

> based on . . . defendant's behaviors post affair that she felt very bad, very guilty and that she was trying to make amends so she and plaintiff could [reunify] and maybe one day get remarried. Whether her aspirations were based on her love of [plaintiff] or the standard of living she may have enjoyed during the marriage or a combination of these factors is not dispositive to the issues before the court.

Although the judge found that the assets subject to equitable distribution had been largely premarital, he determined they became marital property when plaintiff transferred them to defendant as part of the asset protection plan. The judge also acknowledged that the value of the marital estate after the bankruptcy was drastically reduced to $4.8 million. However, the judge determined defendant lacked credibility when she stated she did not know the value of the parties' assets, was unaware of the asset protection plan, and did not understand the nature of the bankruptcy proceedings. Instead, the judge found defendant

25

"was completely aware of the asset protection plan" and its purpose; had "full access to the vast majority, if not all, of the parties' bank accounts, CDs, [and] credit cards"; knew the value of the marital estate; and was "fully aware" of the bankruptcy proceedings. The judge also credited plaintiff's testimony about delaying the divorce filing once defendant disclosed the affair to avoid disrupting the bankruptcy proceedings.

Turning to the MMA and the PSA, the judge summarized defendant's argument regarding her execution of the documents as follows:

> Defendant has asserted fraud in the procurement and execution of the MMA and PSA based primarily on her assertions that she, without any question, did whatever . . . plaintiff told her to do. She has also argued that she has a moderate language barrier and at times is unable to understand certain phraseology of the English language which made some of her testimony at trial . . . confusing. She has also claimed that plaintiff would direct her to sign documents without review because of his controlling nature over her. She makes these assertions concerning the execution of the MMA, PSA and both POAs.

The judge rejected defendant's claims as "incredible." As to the MMA, the judge distinguished Pacelli where we invalidated an MMA based on the coercive effects inherent in the circumstances where a wife was presented with the difficult choice of preserving her marriage and raising her sons in an intact family or refusing to sign an MMA. 319 N.J. Super. at 190. Here, the judge

26

found the fact that the MMA was incorporated into the PSA differentiated it from Pacelli, as well as the fact that the MMA included a provision that defendant "[did] not waive any rights whatsoever under the [d]ivorce [l]aws of the State of New Jersey." In addition, according to the judge, "the MMA and PSA were executed shortly after it was divulged that [defendant had] engaged in an [extramarital] affair which temper[ed] any argument that either party had [a] reasonable belief that the agreements were not intended to define the terms which would terminate the marriage."

Although the judge acknowledged that Klein and plaintiff had lied at the divorce hearing when they represented to the trial court that an attorney had reviewed the PSA on defendant's behalf, the judge also rejected defendant's assertions "that she believed Mr. Browndorf represented her as to the financial affairs of the parties and that Mr. Klein represented her in the divorce matter." The judge found ample evidence to support his finding that neither Klein nor Browndorf ever represented defendant, including Browndorf's credible testimony that he never represented defendant and that the retainer agreement containing both parties' names was sent by the firm in error. Further, the judge found that defendant "was aware of her right to obtain counsel and chose to be unrepresented" in the divorce matter. In support, among other things, the judge

27

relied on the plain language contained in the MMA and the PSA "concerning the right to legal representation to review the agreements." The judge also noted that defendant, "with reasonable diligence, could have contacted an attorney to review the PSA directly." Instead, according to the judge, defendant signed the documents "freely and voluntarily and without coercion, fraud or duress," and acknowledged in the PSA that she understood and agreed to the terms.

The judge explained:

> The court finds the assertions made by defendant to be incredible under the totality of the circumstances. Although this court can understand that there may be certain language barriers for defendant, the court's observations of defendant at trial do not support her assertions that she misunderstood questions and facts at the time she executed the documents being challenged herein . . . . The court finds defendant understood the vast majority of questions during cross[-]examination and all of the questions posed to her on direct. The court finds that defendant was not so controlled by plaintiff to completely vitiate her free will to review documents which were presented to her for signature including those surrounding the settlement agreements and other legal documents which she signed. The court finds defendant has not proven by a preponderance of the evidence that she was forced or coerced to sign the documents in question. The court finds she signed the documents freely and voluntarily.

A-1778-22

Turning to the fairness of the PSA and underlying MMA, the judge posited:

> The question the court needs to answer is[:] [W]ere the terms of the PSA excessively disproportionate to the advantage of plaintiff and to the detriment of defendant considering the nature of the assets, how the assets were acquired, whether the assets were originally acquired before the marriage, any increase/decrease in value to said assets during the marriage and whether the increase or decrease was due, in whole or in part, to the active efforts of either or both parties?

The judge found that the PSA awarded defendant $200,000 as equitable distribution, the 2010 Mercedes valued at $55,000, personal items including her jewelry and handbags, as well as $57,000 for her mother. Although plaintiff did not provide any expert testimony, the judge partially accepted plaintiff's testimony that the value of defendant's jewelry was $1 million because defendant did not offer "any real rebuttal as to his valuation." Further, the judge determined that the funds defendant withdrew from plaintiff's BOA account on September 2, 2014, represented the $200,000 equitable distribution payment required in the PSA and rejected defendant's claim that she never received the $200,000 payment. The judge also found that plaintiff paid defendant's mother $57,000 on February 24, 2014, as required under the PSA. The judge concluded that, "although the PSA was not optimal to defendant[,] . . . [its] terms as to

29

distribution of assets was not so highly disproportionate to defendant's detriment considering the totality of the factual circumstances surrounding the marriage."

In addressing defendant's claim that her waiver of alimony in the PSA was unfair and inequitable, the judge analyzed the statutory factors in N.J.S.A. 2A:34-23(b) and concluded that defendant failed to establish unconscionability based on the waiver. The judge explained that when the PSA was signed, the parties had been married for nine years and were married for ten years when the divorce complaint was filed. At that time, "plaintiff was almost [sixty-nine] years old and defendant was [forty-two] years old," and, as of October 2017, plaintiff was seventy-one years old and defendant was forty-five years old. Regarding their earning capacity, the judge found that "plaintiff's average gambling winnings . . . for the four years preceding the execution of the PSA in January 2014" were "$45,960 per year," while defendant, who had been "out of the employment market since at least 2004," "had the requisite skills in 2014-2015 to earn at least $30[,000 to ]$40,000 [per year] as a casino employee."

The judge explained that a limited duration alimony award was supportable by "the length of the marriage"; "the standard of living during the marriage and the actual need and ability of the parties to pay"; "the earning capacities, educational levels, vocational skills, and employability of the

parties"; as well as "the length of absence from the job market of the party seeking maintenance." However, by the same token, the factors weighing against an alimony award were "the age[ and] physical and emotional health of the parties; the fact that no children were born of the marriage[;] and the earning capacities, educational levels, vocational skills, and employability of the parties."

According to the judge:

> Essentially, plaintiff was over social security retirement age[,] and defendant was in her mid-forties at that time. Defendant was capable of earning an income and had prior experience in the casino gaming industry.
>
> In addition, it seems undisputed that following the execution of the MMA, PSA and even after the [JOD] was entered up until August 2017, the parties lived together either fulltime, according to defendant, or some of the time[,] according to plaintiff. The court finds the parties substantially continued to operate as they did during the marriage from a financial standpoint until August 2017. . . . Although the PSA did not call for support payments, the court finds that defendant substantially maintained the same standard of living during those two[] and one-half years as she did during the marriage. The court must consider these factors in its evaluation concerning the fairness of the PSA and whether such was unconscionable. The court finds that defendant did receive support from plaintiff on a de facto basis for the two[] and one-half years outlined herein.
>
> [(Italicization omitted).]

In sum, in rejecting defendant's claim that her waiver of alimony was inequitable and unfair, the judge found that plaintiff's age was "an extremely weighty factor" as was the fact that "plaintiff's income in the four years preceding the PSA was not significantly greater than defendant's earning capacity at that time."

In addition to the financial fairness analysis, the judge found that

> defendant was concerned about her fault for the marriage ending due to her [extramarital] affair and was also concerned about having the ability to reunify after the divorce when determining whether she should agree to the terms of the [MMA], PSA and [JOD]. Although the court certainly understands that fault is typically not a substantial factor when determining that person's rights to equitable distribution and spousal support, the court finds defendant's state of mind was such that she considered the ramifications of the affair and her planned reunification efforts as part of the reasons for executing the PSA. The court finds this fact scenario did not provide sufficient facts which would require the vacation of the PSA or [JOD]. Despite these factors the court finds that her guilt and reunification plans do not overcome that she voluntarily and knowingly entered into the PSA and also knowingly waived her right to counsel concerning such. The court finds these choices were consciously made by defendant with the intent and hope that she would convince plaintiff to reunify and potentially remarry in the future. The court finds her choice to do this was done freely and voluntarily. The court finds defendant accepted the risks involved that the reunification process would not be successful after the execution of the PSA and after the entry of the [JOD].

32

Additionally, the judge rejected defendant's argument that the MMA, the PSA, and the JOD were void because they were entered while the bankruptcy proceedings were underway in violation of the automatic stay imposed by 11 U.S.C. § 362(a). "The bankruptcy statute provides that the filing of a bankruptcy petition acts as a stay of the 'commencement or continuation' of a judicial proceeding against the debtor." Clark v. Pomponio, 397 N.J. Super. 630, 637 (App. Div. 2008) (quoting 11 U.S.C. § 362(a)(1)). "The stay is automatic, in that it immediately goes into effect once the bankruptcy petition is filed." Id. at 638.

Although a divorce decree may dissolve a marriage while a bankruptcy proceeding is underway, "because of the automatic stay, it [can]not divide [the couple's] property interests." In re Herter, 464 B.R. 22, 27-28 (Bankr. D. Idaho 2011); see also In re Myers, 491 F.3d 120, 127 (3d Cir. 2007) ("Actions taken in violation of the automatic stay are void, but ratifiable by annulment of the stay."); Bascom Corp. v. Chase Manhattan Bank, 363 N.J. Super. 334, 341 (App. Div. 2003) (explaining that "[u]nless cured by annulment," a "state court judgment entered while the automatic stay is in place renders that judgment void ab initio").

Here, the judge correctly found there was no violation of 11 U.S.C. § 362(a) because the divorce complaint was filed January 13, 2015, and the JOD effectuating the PSA and the MMA was not entered until March 18, 2015, after the bankruptcy court approved the global settlement agreement in December 2014.  Moreover, according to the judge, the PSA was expressly "contingent on the outcome of the bankruptcy matter."  Therefore, plaintiff did not acquire rights to the parties' assets until after the stay was lifted.[9]

The judge also addressed defendant's argument that judicial estoppel barred plaintiff from taking certain positions in the matrimonial action that were inconsistent with positions he took in another legal action.  Specifically, defendant argued during the hearing and renews the argument on appeal that judicial estoppel should have prevented plaintiff from claiming in the matrimonial hearing that CL did not represent both parties in the bankruptcy proceedings while claiming the exact opposite in the CL malpractice action.

---

[9]  The judge also noted that defendant withdrew her $200,000 equitable distribution payment in September 2014, contrary to the terms of the PSA that required the payment upon the entry of the JOD.  Thus, when defendant made the withdrawal, the bankruptcy stay she now invokes was pending.  On this point, the judge said, "[t]o find [defendant] had unclean hands based on her own actions would be an understatement."

A-1778-22

"Judicial estoppel is an equitable doctrine precluding a party from asserting a position in a case that contradicts or is inconsistent with a position previously asserted by the party in the case or a related legal proceeding." Tamburelli Props. Ass'n v. Borough of Cresskill, 308 N.J. Super. 326, 335 (App. Div. 1998). The party may only be judicially estopped if he or she has "successfully" asserted a contrary position in another proceeding. Cummings v. Bahr, 295 N.J. Super. 374, 386 (App. Div. 1996). A position is considered to be successfully asserted "if it has helped form the basis of a judicial determination." Id. at 387. This is because a party "will not be permitted to play fast and loose with the courts." Stretch v. Watson, 6 N.J. Super. 456, 469 (Ch. Div. 1949), rev'd in part on other grounds, 5 N.J. 268 (1950).

Still, judicial estoppel should only be invoked to prevent a miscarriage of justice. Kimball Int'l, Inc. v. Northfield Metal Prods., 334 N.J. Super. 596, 608 (App. Div. 2000). Also, judicial estoppel does not "bar every conceivable inconsistency" in a party's present and past assertions. Cummings, 295 N.J. Super. at 387. Rather, "[j]udicial estoppel . . . is 'an "extraordinary remedy"' that courts invoke 'only "when a party's inconsistent behavior will otherwise result in a miscarriage of justice."'" State v. Jenkins, 178 N.J. 347, 359 (2004) (quoting Kimball, 334 N.J. Super. at 608). In fact, judicial estoppel is

35

considered a harsh remedy and should only be used when the integrity of the judicial process is undermined. Kimball, 334 N.J. Super. at 608.

In rejecting defendant's judicial estoppel argument, the judge reasoned that plaintiff had not successfully asserted a position in the CL malpractice action because the malpractice court had not yet ruled on whether CL also represented defendant. Instead, the judge found that by alleging in the CL malpractice action that CL represented both plaintiff and defendant, "plaintiff . . . merely asserted arguably inconsistent positions as part of his theory of recovery" in the CL malpractice action.

In fact, based on Browndorf's testimony, the judge made findings following the hearing regarding the circumstances surrounding CL's retention that were contrary to those advanced by plaintiff in the CL malpractice action. However, because plaintiff has not successfully asserted a contrary position in another proceeding, we discern no error in the judge's denial of defendant's request to invoke judicial estoppel.

In sum, because the judge's factual findings and legal conclusions are supported by and consistent with the record, we discern no basis to disturb his decision denying defendant's request for Rule 4:50-1 relief. Gnall v. Gnall, 222 N.J. 414, 428 (2015).

## III.

In his cross-appeal, plaintiff argues the judge erred in denying his motion for fees and sanctions. Plaintiff asserts the judge abused his discretion by failing to apply the legal principles governing fee applications in matrimonial matters, by disregarding the express provision of the PSA requiring the violator to pay the counsel fees for a violation of the PSA's terms, and by finding that plaintiff's request for fees and sanctions pursuant to Rule 1:4-8 was barred by plaintiff's failure to send a safe harbor notice.

> New Jersey generally follows the so-called "American rule," which requires that each party pay its own legal costs. [Rendine v. Pantzer, 141 N.J. 292, 322 (1995)]. Nonetheless, fees may be shifted when permitted by statute, court rule or contract. Packard-Bamberger & Co. v. Collier, 167 N.J. 427, 440 (2001). Regardless of the source authorizing fee shifting, the same reasonableness test governs. Litton Indus., Inc. v. IMO Indus., Inc., 200 N.J. 372, 386 (2009).
>
> [Grow Co., Inc. v. Chokshi, 424 N.J. Super. 357, 367 (App. Div. 2012).]

Generally, in matrimonial actions, the award of counsel fees and costs rests in the sound discretion of the trial court. Williams v. Williams, 59 N.J. 229, 233 (1971). "An appellate court will disturb a trial court's determination on counsel fees only on the 'rarest occasions, and then only because of a clear

37

abuse of discretion.'" J.E.V. v. K.V., 426 N.J. Super. 475, 492 (App. Div. 2012) (quoting Rendine, 141 N.J. at 317).

"All applications for counsel fees in family actions must address the factors set forth in RPC 1.5(a)." Id. at 493 (citing R. 4:42-9(b)). "These include the reasonableness of the fees charged given the task and the skill level of the attorney." Ibid. (citing RPC 1:5(a)). The trial court should also consider the factors enunciated in Rule 5:3-5(c), including:

> (1) the financial circumstances of the parties; (2) the ability of the parties to pay their own fees or to contribute to the fees of the other party; (3) the reasonableness and good faith of the positions advanced by the parties both during and prior to trial; (4) the extent of the fees incurred by both parties; (5) any fees previously awarded; (6) the amount of fees previously paid to counsel by each party; (7) the results obtained; (8) the degree to which fees were incurred to enforce existing orders or to compel discovery; and (9) any other factor bearing on the fairness of an award.
>
> [J.E.V., 426 N.J. Super. at 493 (quoting R. 5:3-5(c)).]

Success is "not a prerequisite for an award of counsel fees." Guglielmo, 253 N.J. Super. at 545. Instead,

> the party requesting the fee award must be in financial need and the party paying the fees must have the financial ability to pay, and if those two factors have been established, the party requesting the fees must have acted in good faith in the litigation. Guglielmo, 253 N.J. Super. at 545.

The court in <u>Kelly v. Kelly</u>, 262 N.J. Super. 303, 307 (Ch. Div. 1992), discussed the issue of counsel fees in matrimonial cases as follows:

> Fees in family actions are normally awarded to permit parties with unequal financial positions to litigate (in good faith) on an equal footing. <u>Anzalone v. Anzalone Bros., Inc.</u>, 185 N.J. Super. 481, 486-87 (App. Div. 1982). With the addition of bad faith as a consideration, it is also apparent that fees may be used to prevent a maliciously motivated party from inflicting economic damage on an opposing party by forcing expenditures for counsel fees. This purpose has a dual character since it sanctions a maliciously motivated position and indemnifies the "innocent" party from economic harm. <u>Fagas v. Scott</u>, 251 N.J. Super. 169, 194, 197-200 (Law Div. 1991).
>
> [<u>J.E.V.</u>, 426 N.J. Super. at 493 (citations reformatted).]

<u>Rule</u> 1:4-8 permits a prevailing party to move for sanctions against opposing attorneys and pro se litigants for frivolous litigation, which can include reasonable attorney's fees. <u>See also</u> <u>McKeown-Brand v. Trump Castle Hotel & Casino</u>, 132 N.J. 546, 560 (1993) (holding that pursuant to N.J.S.A. 2A:15-59.1, a prevailing party may also move for sanctions against a party who has filed a frivolous pleading, defined similarly to <u>Rule</u> 1:4-8(a)(1), (2)). "For purposes of imposing sanctions under <u>Rule</u> 1:4-8, an assertion is deemed 'frivolous' when

A-1778-22

'no rational argument can be advanced in its support, or it is not supported by any credible evidence, or it is completely untenable.'" United Hearts, L.L.C. v. Zahabian, 407 N.J. Super. 379, 389 (App. Div. 2009) (quoting First Atl. Fed. Credit Union v. Perez, 391 N.J. Super. 419, 432 (App. Div. 2007)). "We review the trial judge's decision on a motion for frivolous lawsuit sanctions under an abuse of discretion standard." Bove v. AkPharma Inc., 460 N.J. Super. 123, 146 (App. Div. 2019).

In order to seek sanctions, Rule 1:4-8(b)(1) requires a party to file a motion "describing the specific conduct" alleged to violate the rule. Toll Bros. v. Twp. of W. Windsor, 190 N.J. 61, 69 (2007). Prior to filing that motion, however, the aggrieved litigant must provide the offending attorney or pro se party with a separate "written notice" or "demand" that the allegedly frivolous litigation should be withdrawn. Ibid. This notice is generally referred to as a "safe harbor" notice. Ibid. "Strict compliance with each procedural requirement of Rule 1:4-8 is 'a prerequisite to recovery[,]' and failure to conform to the rule's procedural requirements will result in a denial of the request for an attorney's fees sanction." Bove, 460 N.J. Super. at 149 (alteration in original) (quoting State v. Franklin Sav. Acct. No. 2067, 389 N.J. Super. 272, 281 (App. Div. 2006)).

"[T]he judiciary itself has an institutional interest in assuring that the safe-harbor prerequisite to fee-shifting is strictly enforced" because it preserves judicial resources. Id. at 155.

> That said, the Rule requires a court that hears an application against a party to assess whether it is practicable under all the circumstances to require strict adherence to the requirements of Rule 1:4-8. The most fact-sensitive aspect of such an inquiry undoubtedly will involve compliance with the safe[-]harbor requirement that is designed to bring an early stop to offending behavior. Although the notice requirement may have a limiting impact on the compensation that one may receive for costs and fees, the public policies underlying N.J.S.A. 2A:15-59.1 militate in favor of requiring that claims against parties meet the Rule's procedural requirements to the fullest extent possible. By insisting on compliance as soon as practicable, the salutary benefits of adhering to the notice requirement will more promptly rid the judicial forum of frivolous litigation behavior and will concomitantly provide reimbursement for the fees and costs actually attributable to an adversary's uncorrected offending conduct.

[Toll Bros., Inc., 190 N.J. at 72.]

Here, the judge found plaintiff failed to comply with the procedural requirements of Rule 1:4-8(b)(1) by failing to provide a "safe harbor notice" to defendant's counsel "at any time during this approximate five-year litigation." As such, plaintiff was not entitled to a frivolous litigation award and we discern no abuse of discretion in the judge's ruling. In any event, as the judge himself

41

had previously acknowledged, at first blush, given the extent of the marital estate and the fact that defendant was unrepresented when she signed the PSA that was ultimately incorporated into the default JOD, defendant's attempt to set aside the JOD as unconscionable could not be characterized as a frivolous argument.

Turning to plaintiff's request to shift his payment of approximately $1.1 million in counsel fees to defendant, the judge considered the PSA's fee-shifting provision as well as the governing legal principles contained in the matrimonial jurisprudence, and Rules 5:3-5 and 4:42-9. Based on the balancing of the applicable factors and the totality of the circumstances, the judge found that "the American Rule [was] most appropriate" and "it would [therefore] be inequitable to award counsel fees to either party." In support, the judge pointed out that although both parties were granted some form of relief during the litigation, "[b]oth parties were found not to be credible as to certain specific issues in th[e] litigation." The judge also noted that "plaintiff ha[d] substantially more assets than defendant and . . . a much greater ability to pay his own fees."

The judge expounded:

> Both parties are found to have litigated aggressively and vigorously in this matter. The court finds the majority of time spent by the parties during this litigation was incurred due to the unreasonable

position of both parties. Defendant was unreasonable in attempting to vacate the [JOD] by asserting arguments that she did not sign the PSA[,] she was not served the divorce complaint and she was unaware that she was divorced until almost two years after the [JOD] was entered. All of these arguments were clearly rejected by the court. Her assertions that she never received the $200[,000] payment as required by the [JOD] was also a total façade.

Likewise, plaintiff's aggressive and scorched earth litigation tactics resulted in multiple orders and findings by this court that plaintiff was non-compliant with prior court orders, was unreasonable in not answering questions at his deposition, [and] had not paid fees and other costs as ordered by the court. The court finds plaintiff attempted to financially cripple defendant during this litigation as a tactic to get her to give up her claims. The court finds these actions by plaintiff to have been done in bad faith. . . . The court finds plaintiff acted in bad faith to such a degree that even his partial success on the merits should not entitle him to a fee shift. . . .

. . . .

. . . [B]oth parties committed their fair share of deception in this litigation and neither is deserving of the other paying any portion of their counsel fees.

We discern no abuse of discretion in the judge's ruling, which is amply supported by the record. We affirm the counsel fee ruling substantially for the reasons stated in the judge's astute January 10, 2023, written decision.

43

Next, plaintiff argues the judge erred in awarding the Lexus to defendant, in place of the Mercedes that she purportedly never received, and in ruling that plaintiff must reimburse defendant $15,459.21 due on the BOA credit card. Neither of these contentions warrant extended discussion.

As to the former, the judge stated there was no credible evidence "to rebut defendant's claims that she never received full possession of the 2010 Mercedes as required by the [JOD]." As a result, the judge determined that "defendant shall retain the 2017 Lexus and its value on the date of purchase of $52,395.61 shall be credited against the value of the 2010 Mercedes," leaving "a credit to defendant [from] plaintiff in the amount of $2,604.39." The judge's ruling is supported by adequate evidence in the record and we discern no abuse of discretion. "There is no restriction on the court with regard to ordering distribution in kind of the eligible assets or awarding a monetary equivalent thereof." Borodinsky v. Borodinsky, 162 N.J. Super. 437, 443 (App. Div. 1978).

Plaintiff argues the judge erred in rejecting his more credible version regarding defendant's unlawful conversion of the Lexus and in ignoring defendant's deposition testimony that she had in fact received the Mercedes. However, plaintiff agreed in his certification that neither party had possession of the Mercedes when the JOD was entered and conceded that he had signed the

44

title for the Lexus over to defendant. Because the JOD specified that defendant was entitled to the Mercedes in equitable distribution, which was valued at $55,000, we discern no abuse of discretion in the judge's attempt to ensure that defendant received everything she was entitled to under the terms of the JOD. "We have long recognized that a family court is a court of equity, where judges employ a 'full range' of equitable doctrines to deal with matrimonial controversies." Steele v. Steele, 467 N.J. Super. 414, 441 (App. Div. 2021) (quoting Kazin v. Kazin, 81 N.J. 85, 94 (1979)).

In ordering the BOA reimbursement, the judge found the parties used the BOA credit card in defendant's name after the divorce. According to the judge, during the post-judgment period between 2015 and 2017, the parties charged substantial amounts on the BOA credit card, and plaintiff paid the bill each month from his own funds. The charges on the card were for plaintiff's medical bills, attorney's fees, and home supplies, as well as "vacation and restaurant costs for the parties." The first time the bill was not paid by plaintiff was in August 2017, when the domestic violence incident arose. The judge noted that plaintiff contacted BOA and disputed the charges, resulting in a reversal of the charges following BOA's investigation.

The judge determined that plaintiff's actions in that regard "were unreasonable." The judge explained:

> [T]he charges for the $15,459.21 [bill] were made by both parties and were consistent and made in line with the charges for that entire year. Plaintiff's stop payment was inappropriate and was in violation of the practices followed by the parties for the use and payment of the credit line. Defendant had a reasonable expectation and plaintiff had an obligation to pay the bill pursuant to the practices utilized by the parties for the prior six months in 2017. It would be inequitable and unfair for defendant to be responsible for that amount.

We discern no principled reason to interfere with the judge's ruling.

Plaintiff argues defendant had unclean hands and should not be rewarded.

> The basic equitable maxim of unclean hands provides that "[a] suitor in equity must come into court with clean hands and . . . must keep them clean after [the suitor's] entry and throughout the proceedings." A. Hollander & Son, Inc. v. Imperial Fur Blending Corp., 2 N.J. 235, 246 (1949); accord Johnson v. Johnson, 212 N.J. Super. 368, 384 (Ch. Div. 1986); Pollino v. Pollino, 39 N.J. Super. 294, 298-99 (Ch. Div. 1956). "In simple parlance, it merely gives expression to the equitable principle that a court should not grant relief to one who is a wrongdoer with respect to the subject matter in suit." Faustin v. Lewis, 85 N.J. 507, 511 (1981). While "[u]sually applied to a plaintiff, this maxim means that a court of equity will refuse relief to [any] party who has acted in a manner contrary to the principles of equity." Johnson, 212 N.J. Super. at 384.

[Chrisomalis v. Chrisomalis, 260 N.J. Super. 50, 53-54 (App. Div. 1992) (omission and all but second alteration in original) (citation reformatted).]

Here, the judge found that both parties had acted in bad faith, lacked credibility on various issues, and came to court with unclean hands. We find no fault with the judge's ruling.

To the extent we have not addressed a specific argument in either the appeal or the cross-appeal, we deem the argument to be without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION